FOURTH DIVISION
JULY 24, 2008

No. 1-06-3736

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 02 CR 6639 |
| | ) | |
| FRANCISCO ROMERO, | ) | Honorable Dennis A. Dernbach, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Defendant, Francisco Romero, was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)) for the July 28, 2001, shooting death of 12-year-old Francisco Macias. Following a jury trial, on August 7, 2006, defendant was found guilty of two counts of first degree murder. The trial court denied defendant's motion for a new trial and sentenced defendant to 40 years' imprisonment for first degree murder (730 ILCS 5/5-8-1(a)(1)(a) (West 2004)) and an additional 25 years' imprisonment for personally discharging a firearm in the commission of the crime pursuant to the sentence enhancement statute (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004)). Defendant asserts three issues on appeal. Defendant first argues that the jury verdict was not supported by the evidence. Defendant also contends that the trial

1-06-3736

court erred in failing to properly *voir dire* the jury after a jury member saw defendant being led through the courthouse before trial wearing shackles and a Department of Corrections jumpsuit. Finally, defendant argues that he was prejudiced by prosecutorial misconduct during closing arguments. For the following reasons, we affirm.

I. BACKGROUND

At trial, the State presented evidence revealing that on July 28, 2001, the victim and his 11-year-old friend Edgar Jimenez (Edgar) were walking down West 48th Street in Chicago, Illinois, when they happened upon their 10-year-old friend Ivan Diaz (Ivan). Ivan was with his brother Jesus Diaz (Jesus), Jeffery Hooper (Jeffery), and Jose Cepeda (Jose) in front of the Diaz residence at 1714 West 48th Street. The residence was located within the territory of the Latin Souls street gang and Jesus, Jeffery, and Jose were all members of the Latin Souls.

At the time of the shooting, Jesus was sitting on a chair in front of the house. Jesus had a clear view to the west, but his eastern view was obstructed by a wall next to the gangway that extended alongside the house. The gangway continued back to a coach house and then to the alleyway. The gate to the gangway is approximately six feet tall and, at the time of the shooting, it was closed and locked. Jeffery was standing in the doorway to the house, Ivan was in front of Jesus, Jose was standing in front of the gate to the gangway, and the victim and Edgar were standing farther away, southwest of Jesus. Just prior to the shooting, Jose made a motion to move away from the gate and moved onto the porch. Jesus was talking to the victim when he heard a shot fired, smelled smoke, and saw a bullet enter the right side of the victim's head.

The victim fell to the ground and Jesus ran inside the house and shut the door for a moment. After realizing what had happened, Jesus opened the door and went to see the victim

who was on the ground bleeding and shaking. Jesus told Jeffery to call 911. Jesus testified that he then saw a man with a gun exit the church across the street. He was concerned until the man flashed a police badge and Jesus called him over. Jesus also told Jose to get a towel to place over the victim.

Edgar testified that, at the time of trial, he was a member of the La Raza street gang and that they were at war with every other gang, including the Latin Saints. In addition, Edgar was on probation in juvenile court for possession of a gun. However, at the time of the shooting, Edgar was not affiliated with a gang. Edgar testified that on the day of the shooting, he saw defendant run up the gangway, shake the gate with both hands, and look at Edgar over the fence for a couple of seconds. Edgar noticed that defendant had a teardrop tattoo under his left eye, a shag haircut with a tail in the back and was wearing a baby blue and white shirt, the colors of the Latin Saints. When asked by defense counsel, Edgar admitted that he told the police he saw a teardrop tattoo under the shooter's right eye, but he denied that he told the police he had a bad complexion.

Edgar testified that defendant had a pistol in his right hand which he reached out through the gate and then shot the victim. Edgar testified that he fled to a nearby house, ran up to the second floor and asked some ladies in the house to call an ambulance. Edgar returned to the scene to find the victim with blood on his face, shaking, and his eyes were turning white. Edgar then ran home because he was scared and did not talk to the police on the scene. When presented with his original statement to the police that he ran into a beauty shop, Edgar admitted that he made that statement. Edgar explained that the first floor of the building he ran into a building that looked like a beauty shop, but he ran up to the second floor.

Edgar identified defendant in the courtroom as the shooter. Edgar also testified that, with

his mother present, he was interviewed by detectives on the night of the shooting at his home and again a couple nights later when they brought photos. Edgar testified that he identified defendant's photograph as that of the shooter. On August 1, 2001, he was going to the victim's wake with his mother and siblings when his sister asked him if a man across the street was the shooter. Edgar saw defendant eating at a hot dog stand and told his family that defendant was the shooter. The family went into a store and Edgar's sister called the police and gave an anonymous tip. They waited in the store as the police arrived and arrested defendant and then went to the wake. A few days later, Edgar viewed a lineup at the police station and identified defendant again as the shooter.

Detective Allen Szudarski of the Chicago police department was assigned to investigate the shooting and responded to the scene shortly after the shooting occurred. Witnesses of the shooting stated that there was only one offender. Szudarski returned to the police station with Jose and worked with him to create a composite sketch based on descriptions provided.

Szudarski testified that on July 30, 2001, he compiled a group of photographs of people arrested for various crimes that resembled the description of the suspect. Defense counsel objected to Szudarski's characterization of the photographs as gathered from men who had been arrested in the past and the trial court overruled the objection. The prosecutor next asked Szudarski if he had a picture of defendant, in addition to the pictures of men previously arrested. Several of the men in the photos had marks under their right eye, though defendant was the only one pictured with a teardrop tattoo under his left eye. Szudarski took the photo array to Edgar's home and Edgar identified defendant from the photos as the shooter.

Later that day, Detective John Henry interviewed Edgar at his home. Edgar told Henry that the shooter had a teardrop tattoo under his right eye, bushy eyebrows, and a bad complexion

and was wearing a dark blue shirt. Edgar also told Henry that after the shooting, he ran westbound to a beauty shop.

Fabian Gomez, a member of the Latin Saints street gang, testified that he had been working with the Chicago police as a confidential informant since May 2001. Gomez provided information in exchange for the dropping of aggravated kidnapping charges against him in an unrelated case. Gomez saw the composite sketch of the suspect on television and thought it looked like defendant, despite the teardrop tattoo being located on the wrong side.

On August 1 or 2, 2001, Gomez was driving his van with other gang members when he pulled up alongside defendant. When Gomez told defendant he was famous, he replied "Yeah, you seen that s---?" Defendant also told Gomez that the police had picked him up for the murder, but let him go. Gomez told defendant "that dude - that guy wasn't s---," meaning that the victim was not in a gang. Defendant told Gomez, "F--- that, he was a Soul; his name was Little Dog." In addition, Gomez also called defendant "gay" because he was clean shaven and defendant responded that he had to shave because the composite sketch looked like him.

Detective Thomas Cepeda, Jr., no relation to Jose Cepeda, was assigned to investigate this case on July 31, 2001. Cepeda learned that defendant was in custody in response to an anonymous 911 call on August 1, 2001. Despite being identified in a photo array, defendant was released from custody because Cepeda and his partner were unable to locate witnesses to complete a lineup identification. On August 2, 2001, Cepeda interviewed Edgar at his home and learned that Edgar and his family made the anonymous 911 call.

Defendant was located and placed under arrest again. Following a pat-down of defendant, he immediately told Cepeda, "hey they already arrested me yesterday for that shooting of the little kid and they let me go," even though there was no discussion about the shooting.

Defendant was taken to the police station to view a lineup. On August 3, 2001, Cepeda located Edgar and brought him to the station to view a lineup. Since defendant was wearing his gang colors, he requested and was given a different-colored T-shirt for the lineup. Defendant was also given a bandage to cover his teardrop tattoo and all men in the lineup wore a similarly placed bandage.

Edgar viewed the lineup and identified defendant as the shooter. Despite his efforts, Cepeda was unable to locate any other witnesses. He also testified that he believed Jose Cepeda was in hiding because he could not be located. The trial court sustained defense counsel's objection to the claim that Jose was in hiding. Cepeda also admitted that during his first interview, Edgar described the shooter as having big lips, bushy eyebrows, a bad complexion and a teardrop tattoo under his right eye.

Also during trial, defense counsel informed the judge that a juror had seen defendant in shackles and his jail jumpsuit when he was escorted into court by two officers. One of the officers was questioned by the trial court and explained that when they were escorting defendant into court, the door to the jury room was not locked and a juror walked out to see defendant. The trial court asked defense counsel if the defense wanted the juror instructed. After taking time to consider the situation, defense counsel moved for a mistrial, which was denied. The trial court gave defense counsel the option to *voir dire* the juror to determine who may have seen defendant in shackles and instruct the juror. Defense counsel requested the trial court admonish the entire jury that it could not consider the fact defendant was in custody in its deliberations. The trial court admonished the jury that whether or not a defendant is in custody is not relevant in considering his guilt or innocence.

The jury returned a guilty verdict against defendant for first degree murder. Defendant filed a posttrial motion for a new trial. The motion was denied and defendant received a sentence of 40 years' imprisonment for first degree murder with an additional 25 years' imprisonment under the firearm enhancement statute. Defendant now appeals his conviction.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant argues that the State failed to produce sufficient evidence at trial to support the guilty verdict. Defendant argues that the State failed to meet its burden of proving guilt beyond a reasonable doubt and this court must reverse his conviction. *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). In Illinois, a reviewing court must view the evidence in a light most favorable to the prosecution, allowing all reasonable inferences to determine if no reasonable person could find defendant guilty beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

Defendant asserts that his conviction rests purely on a questionable identification by Edgar. While defendant admits that a single eyewitness identification may be sufficient to sustain a conviction, he argues that where there is no physical evidence and an identification is in doubt, reversal is proper. *People v. Cullotta*, 32 Ill. 2d 502, 504 (1965). Defendant states that five factors are to be considered in evaluating the likelihood of the misidentification of a perpetrator, including: (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification. *People v.*

*Slim*, 127 Ill. 2d 302, 308 (1989). Defendant contends that the inconsistent descriptions and suggestive identifications raise a reasonable doubt as to his guilt under the *Slim* factors.

Defendant argues that the third factor weighs heavily in favor of reversal. Defendant points to Edgar's inconsistent descriptions of the perpetrator. Originally, Edgar stated that the teardrop tattoo was on the right side of the face and the shooter had a bad complexion and wore a dark blue shirt. Edgar's description of the shooter at trial changed to a teardrop tattoo on the left side, a shag haircut and a light blue and white shirt. Defendant also argues that the first two *Slim* factors are not in the State's favor because of this deficient and inconsistent description of the suspect. In addition, because the gate was locked and taller than defendant, defendant argues that Edgar did not have a clear opportunity to view the shooter. Defendant adds that Edgar originally said he was on a bike and then ran into a beauty parlor, but testified at trial that Ivan Diaz was on a bike and that he ran to a house. Further, before the grand jury, Edgar said the shooter opened the gate and then pulled a gun out before shooting. Accordingly, defendant argues that Edgar's description and testimony were inaccurate and these inconsistencies weigh in favor of reversal based on the first three factors.

Defendant contends that analysis of the fourth and fifth factors also weighs in favor of reversal. Defendant claims that because of the underlying circumstances with Edgar's identifications, they cannot be considered accurate. He claims that the photo array did not contain any pictures of men with teardrop tattoos and was highly suggestive to the 11-year-old Edgar. Therefore, Edgar was inclined to pick his picture over the others. For the second identification in the street, defendant argues that Edgar's sister pointed out defendant and suggested to Edgar that he was the shooter. Defendant concludes that the lineup identification

was then rendered uncertain because Edgar was overwhelmed and had repeatedly been sent the message that defendant was the shooter such that his identification was a foregone conclusion. As for timeliness, defendant argues that subsequent to the incident, Edgar became a member of a rival gang and was motivated to identify defendant as the shooter at trial because of the ongoing "war" between gangs.

Defendant adds that the credibility of the State's identification witnesses, Edgar and Fabian Gomez, was lacking because of the witnesses' gang affiliations. Furthermore, defendant notes that Gomez did not independently produce his information, but was actively working with the police to try and clear the charges against him. Defendant contends that even if Gomez was credible, defendant's comments may have been nothing more than his relaying what the police had told him when he was initially arrested.

In reviewing defendant's arguments and undertaking a review of the *Slim* factors, we note that it is the function of the trier of fact to assess the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *People v. Cox*, 377 Ill. App. 3d 690, 697 (2007). As the trier of fact, the jury is in the position to view a witness while he or she is being questioned and may believe as much, or as little, of any witness' testimony as it sees fit. *People v. Mejia*, 247 Ill. App. 3d 55, 62 (1993). Whether eyewitness testimony is trustworthy is typically within the common knowledge and experience of the average juror, and if trustworthy, a single positive eyewitness identification may be sufficient proof of guilt. *People v. Rojas*, 359 Ill. App. 3d 392, 397 (2005). Therefore, we will not substitute our judgment for that of the fact finder on what weight is given to the evidence presented or the credibility of the witnesses. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

Defense counsel ably presented the facts surrounding the two key witnesses, Edgar and Gomez. The jury was apprised of each witness' criminal history and his gang affiliations at the time of trial. Defense counsel highlighted the inconsistencies between Edgar's trial testimony, grand jury testimony, and statements to the police. Reviewing the evidence under the *Slim* factors, we find there was sufficient evidence to support Edgar's testimony and defendant's conviction.

While Edgar's testimony at trial was that he saw defendant through the gate, in his prior statements he claimed that he saw defendant's face without obstruction. Despite this, there was evidence to support a finding that Edgar had a clear opportunity to view the shooter under the first and second factors. The evidence showed that the shooting occurred during the middle of a sunny day. Edgar was within close proximity of the gate and the victim and he had a clear sightline to the gate. Further, Edgar's degree of attention was demonstrated by his testimony that he had an opportunity to see defendant over a few seconds as he came up the gangway, grabbed the gate and then pointed his weapon and fired the fatal shot. Edgar testified that he was able to clearly see defendant's face before he fled, supporting the conclusion that his identification was not based on any suggestive actions of the police.

The third factor - the accuracy of Edgar's description - is the centerpiece of defendant's argument. As the State notes, under *Slim*, discrepancies and omissions as to physical characteristics or clothing and appearance in a description are not necessarily fatal, but affect the weight to be given that testimony. *Slim*, 127 Ill. 2d at 308, 312. Edgar described the shooter to the police as having the teardrop tattoo on the right side, being 5 feet 9 inches tall with a bad complexion and bushy eyebrows. At trial, Edgar testified that defendant was wearing a baby

blue and white shirt and had a shag haircut and a teardrop tattoo under his left eye. Defendant argues that Edgar, who was only 11 years old at the time, was under stress and obviously did not present a reliable description. However, this again is not fatal under *Slim*; discrepancies such as these are commonly made by untrained observers under stress. The jury was presented with the attendant circumstances and able to weigh the testimony accordingly.

Testimony at trial indicated that each time Edgar was presented with an image of defendant or was in front of defendant, he immediately identified him as the shooter. Detective Szudarski testified that no suggestive comments were made and Edgar immediately and unequivocally identified defendant each time. As to the final factor, Edgar's initial identifications were all made within days of the shooting; thus the time frame would not be a detrimental factor to the weight of Edgar's identifications.

The attendant discrepancies in Edgar's statements and testimony, his prior criminal record and his subsequent gang affiliation go to the weight of Edgar's testimony. Likewise, Gomez's gang affiliation and status as an informant and Edgar's current gang membership could arguably lead to an incredible in-court identification by Gomez. However, prior convictions alone do not make evidence incredible. *People v. Killingsworth*, 314 Ill. App. 3d 506, 510-11 (2000). Defendant attempts to argue on appeal that Gomez had this motivation to lie and it is possible that defendant was not necessarily providing a justification for the shooting, but simply relaying information received from the police.

These criminal histories do not remove the fact that Edgar affirmatively identified defendant three prior times as the shooter, all within days of the shooting. While neither of the witnesses is a "shining example of good citizenship," as in *Killingsworth*, the jury was made

aware of the witnesses' criminal and gang histories and was able to weigh the testimony of each witness and make its determination. *Killingsworth*, 314 Ill. App. 3d at 510. Considering the evidence in a light favorable to the prosecution we find there was sufficient evidence to support Edgar's identification and the jury verdict.

### B. Right to a Fair Trial

Defendant next asserts that he was denied his right to a fair trial because, during the middle of the trial, the jury was able to see him in shackles and jail uniform and the trial court did not *voir dire* the jury to determine if it remained impartial. Defendant notes that a criminal defendant has a constitutional right to appear in court for trial unencumbered by the markings of guilt, standing with the "appearance, dignity, and self-respect of a free and innocent man." *In re Staley*, 67 Ill. 2d 33, 37 (1977). However, he also notes that where the defendant has not been forced to sit through trial in shackles, but only an accidental viewing of the restrained defendant occurs, it is not reversible error absent an affirmative showing of prejudice. *People v. Greene*, 102 Ill. App. 3d 933, 936 (1981).

Defendant argues that the image of him in a jail jumpsuit and shackles resulted in a belief that he was dangerous and was compounded by the fact he sat between the officers, who were in plain clothes, during trial. Further, he claims that additional comments elicited by the State during trial established the image that defendant was a career criminal and dangerous. Defendant cites to Detective Cepeda's comments that he compiled the photo array from photographs of people arrested for crimes in the area that fit the description, that a lineup is composed of criminal offenders, and that he believed he could not locate Jose because he was in hiding. Defendant argues that the last comment implied that Jose was hiding because he feared

retribution from defendant.

Defendant concludes that, in total, these numerous signals prejudiced him in the eyes of the jury because they created the image of a dangerous repeat offender. Defendant argues that this was prejudicial because of the lack of physical evidence and the suspect identification by Edgar. Defendant notes that there is no question that a juror saw him in shackles as it was confirmed by the corrections officer. Defendant asserts that this prejudicial error was compounded by the trial court's lack of prompt action in failing to *voir dire* the jury immediately, instead waiting until the end of the trial to instruct the jury. Defendant argues that other jurisdictions have followed this procedure and it is necessary to assure a fair and impartial trial. See *United States v. Johnson*, 911 F.2d 1394 (10th Cir. 1990); *People v. Jacobs*, 210 Cal. App. 3d 1135, 258 Cal. Rptr. 734 (1989).

We agree with the State that the juror's brief encounter with a shackled defendant outside the courtroom presented a "tenuous prejudicial effect" at best. *People v. O'Toole*, 226 Ill. App. 3d 974, 985 (1992). Because this case involves only a brief and accidental encounter by one juror with defendant while he was shackled and in a jail uniform. Under *Greene*, defendant must affirmatively show that he was prejudiced by the encounter and the trial court's handling of the situation. While defendant correctly notes the *O'Toole* court's comments on the prejudicial effect of such an encounter are *dicta*, the holding that the trial court is in the best position to determine if a juror can impartially weigh the evidence stands and we will not reverse such a decision unless it is against the manifest weight of the evidence. *O'Toole*, 226 Ill. App. 3d at 986.

The trial court in this case found that a single juror's accidental viewing of defendant in

-13-

custody was not sufficient to warrant a mistrial. Accordingly, the trial court denied defendant's motion for a mistrial in line with Illinois and foreign case law. The trial court also granted defense counsel the opportunity to *voir dire* the juror who saw defendant to determine what the juror saw, if any other jurors were informed and if it would affect that juror's ability to be fair and impartial. Defense counsel ultimately accepted the trial court's alternate option, which was to admonish the entire jury that whether a defendant is in custody during trial is irrelevant to the proceedings and not a consideration in determining guilt or innocence.

Defendant contends that the decision of defense counsel is irrelevant because the trial court abused its discretion. Defendant claims that the only proper course of action for the trial court was to *voir dire* the jury like in *Johnson* and *Jacobs*. However, each of these cases notes the acceptance in those jurisdictions that a brief observation of a defendant in physical restraints by one or more veniremen does not warrant a mistrial. *Johnson*, 911 F.2d at 1397; *Jacobs*, 210 Cal. App. 3d at 1141, 258 Cal. Rptr. at 737. While the trial court in *Johnson* made a "full inquiry" as to the jury remaining impartial and defense counsel in *Jacobs* conducted "extensive *voir dire*" of prospective jurors, these cases do not mandate these actions. See *Johnson*, 911 F.2d at 1397; *Jacobs*, 210 Cal. App. 3d at 1142, 258 Cal. Rptr. at 738. At most, these cases require action upon the request of the defendant. The trial court in this case appropriately gave defense counsel the option to conduct an inquiry of the juror and to include an admonishment of the jury. Upon counsel's decision, no *voir dire* was conducted and the jury was properly admonished.

With respect to the testimony of Detective Cepeda, we do not find that his testimony bolsters defendant's argument that he failed to receive a fair trial. The trial court sustained an objection to Detective Cepeda's comment that he thought Jose Cepeda was in hiding. While the

trial court did not specifically admonish the jury to ignore this comment, neither the detective nor the State attempted to claim that Jose was in hiding because he feared retribution by defendant. The detective's commentary on how he assembled photographs for the photo array shown Edgar also was not prejudicial. The State specifically followed up his comment that he took photographs of men recently arrested in the neighborhood by eliciting that Detective Cepeda added these photographs to a picture he had of defendant.

Defendant has not made an affirmative showing of prejudice. As *O'Toole* and *Jacobs* note, it is commonly known and accepted that, to protect the public and the prisoner, it is customary to use physical restraints on the prisoner. The inadvertent viewing by a juror was cured by the trial court's admonishment. Despite defendant's contention that the admonishment was deficient because the trial court described it as "informational," the trial court properly informed the jury of its responsibilities and what it could consider in rendering judgment. Furthermore, the trial court further granted defense counsel the option to *voir dire* the juror, but counsel rejected that offer. The trial court properly handled defendant's exposure to the juror while shackled and no prejudice was suffered to warrant a new trial.

## C. Prosecutorial Misconduct

Defendant next claims that he was prejudiced by prosecutorial misconduct during the State's closing rebuttal argument. Defendant argues that the State misrepresented the evidence during closing argument in an attempt to bolster Edgar's inconsistent statements and testimony. Defendant claims that the State improperly misstated the evidence by arguing that defendant was identified as the shooter by two people - Edgar and Gomez. Defendant contends that the State continued to prejudice his case by improperly shifting the burden to the defense.

He argues that the State improperly argued that the defense did not want the truth and could have asked open-ended questions of witnesses regarding the evidentiary inconsistencies in the case, instead of attempting to distract the jury with speculation.

Defendant however waived argument on this issue for failing to object to the comments argued as improper here on appeal, and therefore the issue was not preserved for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant cites defense counsel's objection to the State's argument that they did not seek clarification regarding the location of the teardrop tattoo on the suspect preserved this issue. Defense counsel objected and simply stated that he asked that question, and he was overruled by the trial court. However, counsel did not object to any of the other comments during rebuttal or raise the issues of burden shifting, misstatement of evidence or improper argument.

In his reply brief, defendant advances the alternative argument that this issue must be reviewed under the plain error doctrine. Under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), nonpreserved errors may be reviewed on appeal if the evidence is closely balanced or where the errors are of such a magnitude that defendant was denied a fair and impartial trial. *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000). These exceptions are narrow and limited in scope to protect the rights of the defendant and the integrity and reputation of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). The defendant bears the burden of persuasion in proving plain error. *Herron*, 215 Ill. 2d at 187.

The evidence in this case was not so closely balanced to support plain error review under the first prong. As noted above, where the jury's determination is dependent upon eyewitness testimony, its credibility determinations are entitled to great deference and will be upset only if

unreasonable. *Cunningham*, 212 Ill. 2d at 280. Defendant has argued that the inconsistencies in Edgar's testimony and the lack of physical evidence support the conclusion that the evidence was closely balanced. The evidence at trial indicated that Edgar repeatedly and unequivocally identified defendant as the shooter in a photo array, in public view, and in a lineup. The jury obviously found Edgar credible, and as outlined above, the record does not demonstrate that this finding was unreasonable.

Waiver notwithstanding, the alleged prosecutorial misconduct was not sufficient to overcome the evidence and support reversal. In reviewing allegations of prosecutorial misconduct, this court must consider the arguments of both the prosecutor and the defense in their entirety and place the allegations of improper comments in context. *People v. Evans*, 209 Ill. 2d 194, 225-26 (2004). The prosecution has the right to comment on the evidence presented at trial and draw all reasonable inferences deducible therefrom. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). The prosecution may also respond to comments made by defense counsel. *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001). It is well settled that prosecutors enjoy wide latitude in closing arguments and that the scope of permissible argument rests within the sound discretion of the trial court. *People v. Griffin*, 368 Ill. App. 3d 369, 376 (2006). Any improper comments or remarks made by a prosecutor in closing arguments are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. *People v. Sutton*, 316 Ill. App. 3d 874, 893 (2000).

Defendant's first argument is that the State misstated the evidence by arguing that defendant was identified by both Edgar and Gomez as the shooter. Defendant notes that a prosecutor's argument must be grounded in facts established by the evidence and that

misstatement of the evidence may not be argued. *People v. Williams*, 333 Ill. App. 3d 204, 214 (2002). *Williams* also notes that reasonable inferences may be properly argued. *Williams*, 333 Ill. App. 3d at 214. When viewing the comments regarding Gomez in the full context of the State's argument, it is clear the evidence was not misstated. The prosecutor specifically instructed the jury to consider the inferences to be drawn from Gomez's testimony and made clear that Edgar provided the only eyewitness identification. It was reasonable to infer and argue that the circumstantial evidence and discussion allowed the inference that Gomez identified defendant as the shooter.

The State argues that defendant's second claim of misconduct also involves comments that were taken out of context and invited by defendant. The State argued in rebuttal that defense counsel had the opportunity to question Gomez and Cepeda regarding their conversations and Edgar concerning the shooter's teardrop tattoo, bad complexion, and other inconsistent details to develop his speculative arguments. The State continued to argue that defendant was not interested in finding the truth, but in presenting this speculation to confuse the jury. The State offered these arguments to rebut defendant's claims that Gomez and Cepeda lied regarding the conversations between Gomez and defendant and Gomez and Cepeda.

With respect to classifying defendant's argument as speculative, the State did not accuse defense counsel of fabrication, trickery, deception or suborning perjury, but properly commented that the jury should focus on the facts in evidence and not the speculative arguments advanced by defendant. *People v. Kirchner*, 194 Ill. 2d 502, 549-50 (2000). In response to defendant's arguments, the State also highlighted that defendant did not question the witnesses to support his speculative argument. Contrary to defendant's assertion, the State did not switch the burden to

defendant to clear up weaknesses in its case. The State argued that the jury should focus on the evidence adduced at trial that supported conviction and that defendant failed to support his speculative argument. Based on the entire record and the defense's arguments, the prosecutor's argument did not exceed the bounds of proper argument.

III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

NEVILLE, P.J., and CAMPBELL, concur.