NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180203-U

NO. 4-18-0203

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 1, 2020
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Douglas County |
| MICHAEL L. COX, | ) | No. 17CF14 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Richard Lee Broch Jr., |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, concluding (1) the trial court did not abuse its discretion by barring defendant from introducing rebuttal evidence under section 115-7.3 of the Code of Criminal Procedure of 1963, (2) defendant was not denied a fair trial despite some jurors allegedly seeing him in handcuffs outside of the courtroom, (3) the 10-year statutory enhancement imposed on defendant's sentence does not violate the proportionate-penalties clause, and (4) defendant forfeited his argument that the trial court failed to properly admonish prospective jurors pursuant to Illinois Supreme Court Rule 431(b).

¶ 2     A jury found defendant, Michael L. Cox, guilty of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2016)). The trial court sentenced him to 20 years' imprisonment, which included a 10-year statutory enhancement for threatening to use a dangerous weapon. See 720 ILCS 5/11-1.30(d)(1) (West 2016).

¶ 3    Defendant appeals, arguing (1) the trial court erred in barring him from presenting evidence under section 115-7.3 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/115-7.3 (West 2016)) to rebut the State's other-crimes evidence; (2) he was denied a fair trial because some of the jurors saw him handcuffed outside of the courtroom; (3) the 10-year statutory enhancement imposed on his sentence for threatening to use a dangerous weapon violates the proportionate-penalties clause (Ill. Const. 1970, art. I, § 11); and (4) the trial court erred by failing to properly admonish the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 4                                I. BACKGROUND

¶ 5                                A. The Charges

¶ 6    On February 7, 2017, the State charged defendant by information with aggravated criminal sexual assault (count I) (720 ILCS 5/11-1.30(a)(1) (West 2016)) and criminal sexual assault (count II) (720 ILCS 5/11-1.20(a)(1) (West 2016)). Count I alleged that "on or about February 3, 2017, *** defendant committed acts of sexual penetration with A.Y., 29 years old, by the use of force at a time when *** defendant threatened to use a dangerous weapon other than a firearm, in that he told A.Y. he had a knife in his pocket, asked her if she wanted to get hurt, and then penetrated her vagina and her anus with his penis while holding her down ***." Count II alleged that defendant "penetrated A.Y.'s vagina and anus with his penis while covering A.Y.'s mouth with his hand and by placing his forearm across her throat, making it difficult for A.Y. to breathe ***."

¶ 7                          B. The Section 115-7.3 Motions

¶ 8    Prior to trial, the court granted the State's motion to introduce other-crimes evidence—testimony from defendant's ex-wife, D.C., that defendant sexually assaulted her in

October 2016—under section 115-7.3 of the Criminal Procedure Code (725 ILCS 5/115-7.3 (West 2016)) for the purpose of showing defendant's propensity to commit sexual assaults. Defendant moved to introduce rebuttal evidence that he was never charged with sexually assaulting D.C. Defendant argued the no-charge evidence was necessary "so the jury gets a full picture" of D.C.'s testimony. The State maintained that the no-charge evidence was "neither relevant nor probative" because the State could still charge defendant, as the statute of limitations had yet to expire. The trial court denied defendant's motion, explaining that the absence of charges "ha[d] to do with the State's Attorney's office and what they had going through their minds ***." The court did, however, determine that defendant would be permitted to ask D.C. on cross-examination whether she filed a criminal complaint against him.

¶ 9                                  C. Jury Trial

¶ 10                                  1. *Voir Dire*

¶ 11        The trial court conducted *voir dire* in panels of four jurors each and individually admonished the prospective jurors in each panel regarding the legal principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The court asked some of the prospective jurors whether they "understood and accepted" the legal principles, while it asked others variously whether they "agree[d] with," "agree[d] with and accept[ed]," or "accept[ed]" the principles.

¶ 12                        2. *Defendant's Motion to Remove a Juror*

¶ 13        On the third day of trial, defendant filed a motion to remove a juror, alleging that "after adjournment [the previous] day and without any intention on the part of Douglas County Deputies, one juror *** was loitering about upstairs at the Douglas County Courthouse within steps of the elevator; when Deputies were escorting [defendant] back into the Douglas County

Jail." After hearing the arguments of counsel, the trial court denied defendant's motion, noting that "at the time of the viewing [defendant] was not handcuffed, but that the Court feels it was not unduly prejudicial to [defendant] and I will give instructions to the jurors." Upon returning to the courtroom, the trial court gave the jury the following instruction:

> "THE COURT: I want to take this opportunity, in order to once again indicate to you that the only evidence in this case that matters is testimony and the exhibits that come about as a result of testimony from this chair. That, anything seen or heard outside the courtroom by any of the jurors, is not to be considered as evidence and not to be used in reaching your final decision, nor should anything heard or seen outside the courtroom be communicated to any of the other jurors in this case."

¶ 14                               3. *The State's Evidence*

¶ 15                                    a. A.Y.

¶ 16        A.Y. testified that she lived by herself in a two-story, four-unit apartment building in Arcola. On the night of February 2, 2017, she walked to a nearby bar from her apartment. She sat down at one end of the bar and noticed that defendant was seated at the opposite end. A.Y. described defendant as a friend, although she did not know him very well. At one point during the evening, A.Y. greeted defendant outside of the bar while they were both smoking a cigarette, but defendant did not respond.

¶ 17        When they went back inside the bar, defendant texted A.Y. to inform her that he was having a difficult time coping with his father's suicide. A.Y. testified that defendant's father had committed suicide six months prior. A.Y. texted back that she cared about him and he could always talk to her. The two continued to exchange text messages while seated at opposite ends of

the bar. Defendant left before A.Y. and texted her that he did not want to go home so he was "just going to sleep in [his] truck." A.Y. responded, "I have an apartment. You can stay and talk and wind down." Defendant accepted A.Y.'s invitation, returned to the bar as it was closing around 1 a.m. to pick up A.Y., and drove them to A.Y.'s apartment, stopping briefly along the way to purchase a pizza and beer.

¶ 18          Once inside A.Y.'s apartment, defendant and A.Y. sat on a couch in the living room, drinking beer and eating pizza, and discussed defendant's father's suicide. Defendant finished his pizza and "all of a sudden he hugged [A.Y.]" She initially hugged him back but pushed him away when "the hug was done." Defendant then hugged her a second time, and this time she was unable to push him away. A struggle ensued on the couch, with defendant telling A.Y. to take off her pants and A.Y. screaming, hitting defendant, and telling him to leave her apartment. At one point during the struggle, defendant put his left forearm across A.Y.'s neck and his right hand across her mouth, making it difficult for her to breathe. Ultimately, defendant "pinned both of [her] arms down and *** told [her] he had a knife in his back pocket" and asked if she wanted to live or die. A.Y. testified that she was "terrified" by the threat, so she unbuttoned her pants and defendant pulled them down along with her underwear.

¶ 19          Once A.Y.'s pants and underwear were removed, defendant flipped her onto her stomach on the couch and, after several attempts, penetrated her vagina with his penis. Several minutes later, defendant penetrated her anus with his penis and told her to suck his fingers. A.Y. refused, so defendant forced his fingers inside her mouth. A.Y. bit defendant's fingers, which angered him and caused him to "thrust[ ] harder" in her anus before pulling out and "penetrating [her] vagina again." After "a little while longer," defendant "just stopped." A.Y. did not know whether he had ejaculated. She also did not know how long the assault lasted.

¶ 20        A.Y. testified that defendant put on his clothes and "walked to the door. He was crying. He told me he was sorry and he asked me not to tell anybody." Before leaving, he told A.Y. "that this was the last time he was going to be able to tell me he's sorry, because he was going to drive his truck off of a bridge." A.Y. called the police "immediately" after defendant left. (A recording of the 911 call was played for the jury. One dispatcher testified that the caller sounded "a little frantic," while a second dispatcher testified that the caller sounded "very distraught, upset and anxious.")

¶ 21                                    b. Chandler Jaques

¶ 22        Chandler Jaques, an officer with the Arcola Police Department, testified that he was the first to respond to the 911 call. Jaques arrived at A.Y.'s apartment "approximately seven to eight minutes" after he received the call from dispatch. Jaques described A.Y. as "flustered" and "kind of anxious" when he first made contact with her; he also noted that her clothes appeared to be disheveled. A.Y. informed Jaques that defendant had just raped her. While A.Y. was providing Jaques with her statement, Jaques noticed that someone was attempting to contact her by phone. A.Y. then called defendant, but he did not answer. When A.Y. concluded her statement, Jaques recommended that she go to the hospital to ensure any potential evidence was collected. A.Y. agreed to go if a friend could accompany her.

¶ 23                                    c. Micaela Lennon

¶ 24        Micaela Lennon, "a good friend of [A.Y.'s,]" testified that A.Y. called her at approximately 3:30 a.m. on February 3, 2017. A.Y. asked Lennon to come over "because the police were on their way and she had been raped" by defendant. Lennon stated that A.Y. "sounded frantic. She sounded like something was seriously wrong." When Lennon arrived at A.Y.'s apartment, "[A.Y.] collapsed into [her] arms and was just overcome by grief." Lennon

helped A.Y. to sit down and comforted her while "she was recounting the events of the rape to the police officers." The officers recommended A.Y. go to the hospital for a sexual assault examination, and Lennon volunteered to drive her there. Lennon testified that A.Y. "was somber, shaking, [and] crying" at the hospital while waiting to be examined and repeatedly said something along the lines of, "I fought back."

¶ 25                                   d. Jamie Windish

¶ 26        Jamie Windish testified she was a registered nurse who handled sexual assault cases at Carle Foundation Hospital in Urbana. Windish testified that she performed a sexual assault examination on A.Y. and prepared a sexual assault evidence collection kit. During the pelvic examination, Windish "attempted to do the speculum placement a couple of times, but [A.Y.] was so tender and had swelling, and that was very painful for her, so I stopped." Windish noticed tenderness, redness, and swelling in the vaginal area and "a little bit of tenderness by the anus." She also noticed semen inside of the cervix and collected vaginal and anal swabs. After the examination, Windish completed a report, "put [her] evidence kit together," and informed the police when the kit was ready to be collected.

¶ 27                                   e. D.C.

¶ 28        Prior to the presentation of the State's other-crimes evidence, the trial court gave the jury the following instruction:

>        "THE COURT: Members of the jury, through the testimony of the next
>        witness in this case you are going to be receiving evidence that [defendant] had
>        been involved in offenses against [D.C.] on October 10th, 2016, other than those
>        charged in the Information in this case. This evidence is being received on the
>        issues of [defendant's] propensity to commit Aggravated Criminal Sexual Assault

for [his] [*modus*] *operandi*, design, motive, intent and opportunity and may be considered by you only for those limited purposes.

It is for you to determine whether [defendant] was involved in these offenses and if so, what weight should be given to this evidence on the issues of propensity to commit Aggravated Criminal Sexual Assault for defendant's [*modus*] *operandi*, and that's mode of operation, design, motive, intent and opportunity."

¶ 29 D.C., defendant's ex-wife, testified that defendant sexually assaulted her at her apartment in Mattoon, Illinois, on October 10, 2016. According to D.C., she and defendant were watching a movie late that night while their 22-month-old son was asleep. Defendant attempted to kiss D.C. during the movie, but she pushed him away. Defendant became angry and pulled down her pants. He flipped D.C. over, put one hand over her mouth and the other around her throat, and penetrated her vagina with his penis. At some point, their son entered the room. At first, defendant told D.C. that their son was going to have to watch because she woke him with her screaming, but defendant ultimately stopped and told D.C. to put the child back to bed.

¶ 30 D.C. testified she took their son to her bedroom and laid down with him in bed, hoping this would deter defendant from assaulting her further. However, defendant followed her into the bedroom and told her to make space for him in the bed. Defendant then got into the bed, pulled down D.C.'s pants, and penetrated her vagina with his penis until their son "got up and was crying." D.C. suggested driving the child around the neighborhood to get him to fall asleep. The three of them got into her vehicle and, while she was driving past the police station, she began honking her horn and pulled into the station. D.C. testified that she then reported the

alleged assault to a police officer. (A detective with the Mattoon Police Department testified that he interviewed both D.C. and defendant about the alleged assault.)

¶ 31        On cross-examination, D.C. admitted she had agreed to a parenting plan with defendant more than two months after the alleged assault. D.C. also acknowledged that she had had the opportunity to place restrictions on defendant's visitation with their child, but she chose not to do so.

¶ 32                    f. Sexual Assault Evidence Collection Kit

¶ 33        The parties stipulated to the sexual assault evidence collection kit's chain of custody. Subsequent forensic testing found that defendant's DNA was identified in the vaginal swab. The anal swab was not analyzed.

¶ 34                    4. *Defendant's Evidence*

¶ 35        Defendant testified that he went to a bar on the night of February 2, 2017. He recognized several people at the bar, including A.Y. Defendant further testified that he eventually went to A.Y.'s apartment after leaving the bar. When asked whether he sexually assaulted A.Y., defendant answered, "No sir."

¶ 36                    5. *Verdict*

¶ 37        The jury found defendant guilty of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2016)).

¶ 38                    D. Motion for a New Trial

¶ 39        Defendant filed a motion for a new trial, arguing he was denied a fair trial because (1) the trial court barred him from presenting evidence that he was never charged with sexually assaulting D.C. and (2) some of the jurors saw him in handcuffs outside of the courtroom.

¶ 40    The trial court conducted a hearing on defendant's motion. Defendant called his uncle, John Wheeler, to testify in support of the second argument. Wheeler indicated that he attended every day of the trial, arriving at approximately 8:00 a.m. each morning. He testified that "four to five" jurors observed defendant in police custody. According to Wheeler, one juror saw defendant being escorted out of the courtroom to an elevator, while the remaining jurors were in their vehicles in the parking lot when the sheriff's van arrived and deputies escorted defendant into the courthouse. On cross-examination, Wheeler conceded that he was not certain what the jurors were doing in their vehicles and it was possible they did not observe the deputies escorting defendant into the courthouse. Defendant also testified, stating that he was handcuffed in the sheriff's van when being transported to the courthouse and the handcuffs were removed "when [he] got in the back room." Defendant testified that when court adjourned for the day, he was handcuffed "[w]hen [he] got back."

¶ 41    Following the arguments of counsel, the trial court denied defendant's motion. In rejecting defendant's argument that he should have been allowed to present evidence that he was not charged with sexually assaulting D.C., the court noted that the absence of charges differed from an acquittal and "[t]he [c]ourt cannot look into a crystal ball in order to determine what factors the Coles County State's Attorney's office used in deciding to postpone the filing of charges against [defendant]." With respect to the handcuff argument, the court found "that, because the television and media nowadays regularly depict criminal defendants in handcuffs, *** a juror's viewing of a defendant in handcuffs can no longer be regarded as having shocking effect on a prospective juror's sensibilities."

¶ 42                                    E. Sentence

¶ 43    The trial court sentenced defendant to 20 years' imprisonment, which included a mandatory 10-year statutory enhancement for threatening to use a dangerous weapon. See 720 ILCS 5/11-1.30(d)(1) (West 2016).

¶ 44    This appeal followed.

¶ 45                            II. ANALYSIS

¶ 46    Defendant argues (1) the trial court erred in barring him from presenting evidence under section 115-7.3 of the Criminal Procedure Code (725 ILCS 5/115-7.3 (West 2016)) to rebut the State's other-crimes evidence, (2) he was denied a fair trial because some of the jurors saw him handcuffed, (3) the 10-year statutory enhancement imposed on his sentence for threatening to use a dangerous weapon violates the proportionate-penalties clause, and (4) the trial court erred by failing to properly admonish the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 47                    A. Rebuttal Evidence Under Section 115-7.3

¶ 48    Defendant argues the trial court erred in barring him from presenting evidence under section 115-7.3 of the Criminal Procedure Code (725 ILCS 5/115-7.3 (West 2016)) to rebut the State's other-crimes evidence.

¶ 49    Section 115-7.3, which applies to cases in which the defendant is accused of certain enumerated offenses (including aggravated criminal sexual assault), contains an exception to the general rule that other-crimes evidence is inadmissible to show a defendant's propensity to commit crimes. *People v. Ward*, 2011 IL 108690, ¶ 25, 952 N.E.2d 601; 725 ILCS 5/115-7.3(a), (b) (West 2016). However, if the State is allowed to introduce other-crimes evidence to show propensity, "evidence to rebut that proof or an inference from that proof, may be admissible ***." 725 ILCS 5/115-7.3(b) (West 2016). Generally, we review a trial court's

ruling regarding the introduction or exclusion of evidence for an abuse of discretion. See, *e.g.*, *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 66, 107 N.E.3d 938. "An abuse of discretion occurs when the ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *Ward*, 2011 IL 108690, ¶ 21.

¶ 50   Here, the trial court allowed the State to introduce other-crimes evidence in the form of testimony from defendant's ex-wife, D.C., that defendant sexually assaulted her in October 2016. To rebut this evidence, defendant moved to introduce evidence that he was never charged with the alleged assault "so the jury gets a full picture, [t]hat you know, if [D.C.'s testimony] really carried that much weight and it was believable, the jury should hear that [defendant has] never been charged." The trial court denied defendant's motion, stating that the absence of charges "ha[d] to do with the State's Attorney's office and what they had going through their minds ***." The court did, however, indicate it would allow defendant to ask D.C. on cross-examination whether she filed a criminal complaint against him.

¶ 51   We find the trial court's ruling was not arbitrary, fanciful, or unreasonable. As the court properly noted, the probative value of the no-charge evidence is, at best, minimal. Defendant fails to point to anything in the record that suggests the lack of charges somehow bore on D.C.'s perceived credibility. Moreover, as the State aptly noted in a pretrial hearing on defendant's motion, the statute of limitations had not yet run on the incident relating to D.C. and defendant could still have been charged for that sexual assault. See 720 ILCS 5/3-5(b) (West 2016) (providing a three-year limitations period for most felonies). Thus, defendant's no-charge evidence contained little probative value because it lacked relevance and the jury would have been left to speculate as to why a different state's attorney's office had not yet chosen to charge defendant.

¶ 52    Accordingly, given the lack of relevance and probative value of the no-charge evidence we cannot say that the court's ruling barring admission of the evidence was arbitrary, fanciful, or unreasonable.

¶ 53                    B. Defendant Was Not Denied a Fair Trial

¶ 54    Defendant next argues that he was denied his constitutional right to a fair trial because some of the jurors saw him handcuffed outside of the courtroom. In general, whether an individual's constitutional rights have been violated is reviewed *de novo*. See, *e.g.*, *People v. Hale*, 2013 IL 113140, ¶ 15, 996 N.E.2d 607.

¶ 55    Initially, we note the record does not support defendant's contention that "four or five jurors" saw him handcuffed. He alleges that one juror observed him being escorted to an elevator after court had adjourned for the day, while the remaining jurors saw him in the parking lot being escorted from the sheriff's van into the courtroom. Contrary to defendant's assertions, the trial court specifically found that "at the time of the viewing [by the elevator, defendant] was not handcuffed." As for the jurors in the parking lot, Wheeler, defendant's uncle, admitted on cross-examination at the hearing on defendant's posttrial motion that he did not know what the jurors were doing in their vehicles and it was possible they did not observe defendant being escorted into the courthouse.

¶ 56    Moreover, even if we were to assume "four to five jurors" did in fact briefly observe defendant in handcuffs outside of the courthouse, we would not find that defendant was entitled to a new trial. As the State correctly notes, Illinois case law is clear that a juror's brief observation of a defendant in handcuffs outside of the courtroom does not amount to the denial of a fair trial. See, *e.g.*, *People v. Romero*, 384 Ill. App. 3d 125, 135, 892 N.E.2d 1122, 1130 (2008) ("We agree with the State that the juror's brief encounter with a shackled defendant

- 13 -

outside the courtroom presented a 'tenuous prejudicial effect' at best."); *People v. O'Toole*, 226 Ill. App. 3d 974, 985, 590 N.E.2d 950, 958 (1992) ("Because television and the media regularly depict criminal defendants in handcuffs, a juror's viewing a defendant in handcuffs can no longer be regarded as having a shocking effect on a prospective juror's sensibilities."); *People v. Jackson*, 195 Ill. App. 3d 104, 118, 551 N.E.2d 1025, 1033 (1990) ("We hold that even had the jurors been able to view defendant in the lockup area, no substantial prejudice resulted so as to deprive defendant of a fair trial."); *People v. Hyche*, 63 Ill. App. 3d 575, 583, 380 N.E.2d 373, 379 (1978) ("The fact that jurors may briefly see a defendant in handcuffs is not so inherently prejudicial as to require a mistrial."). Therefore, we reject defendant's argument.

¶ 57                    C. Constitutionality of the Statutory Enhancement

¶ 58         Defendant also argues that the 10-year statutory enhancement imposed on his sentence for threatening to use a dangerous weapon is unconstitutional as violative of the proportionate-penalties clause (Ill. Const. 1970, art. I, § 11). We review the constitutionality of a statute *de novo*. *People v. Sharpe*, 216 Ill. 2d 481, 486-87, 839 N.E.2d 492, 497 (2005).

¶ 59         "To succeed on a proportionate-penalties claim, a defendant must show that either the penalty imposed (1) is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community *** or (2) differs from one imposed for an offense containing the same elements." (Internal quotation marks omitted.) *People v. Leach*, 385 Ill. App. 3d 215, 220, 898 N.E.2d 696, 700 (2008).

¶ 60         Here, defendant contends the statutory enhancement violates the proportionate-penalties clause because sections 11-1.30(a)(1) and 11-1.30(a)(3) of the Criminal Code of 2012 (720 ILCS 5/11-1.30(a)(1), (a)(3) (West 2016)) contain the same elements, yet the 10-year enhancement applies only to the former section. See 720 ILCS 5/11-1.30(d)(1) (West 2016). The

- 14 -

elements of the two offenses are as follows: A person commits aggravated criminal sexual assault under section 11-1.30(a)(1) "if that person commits criminal sexual assault and *** threatens to use *** a dangerous weapon ***." 720 ILCS 5/11-1.30(a)(1) (West 2016). A person commits aggravated criminal sexual assault under section 11-1.30(a)(3) "if that person commits criminal sexual assault and *** acts in a manner that threatens or endangers the life of the victim or any other person[.]" 720 ILCS 5/11-1.30(a)(3) (West 2016).

¶ 61            In *Leach*, this court addressed, and rejected, the exact argument defendant now raises. There, we concluded that "the elements of the two offenses are not identical" and, as a result, the statutory enhancement "does not run afoul of the proportionate-penalties clause." *Leach*, 385 Ill. App. 3d at 221. We reasoned that while section 11-1.30(a)(1) requires only the threat to use a dangerous weapon, section 11-1.30(a)(3) "require[s] an overt act that threaten[s] or endanger[s] the victim's life and not simply verbal threats." *Leach*, Ill. App. 3d at 221. Accordingly, because the two sections do not contain the same elements, defendant cannot succeed on his proportionate-penalties claim.

¶ 62                              D. Juror Admonishments

¶ 63            Lastly, defendant argues the trial court erred by failing to properly admonish the prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, he contends the court failed to "ascertain whether all of the jurors understood" the four principles of law contained in Rule 431(b). Defendant acknowledges he forfeited this argument by not objecting at trial but asks us to review it under the first prong of the plain-error doctrine, claiming the evidence was closely balanced because it involved a "credibility contest."

¶ 64            "The plain-error doctrine permits a reviewing court to by-pass normal rules of forfeiture and consider '[p]lain errors or defects affecting substantial rights *** although they

- 15 -

were not brought to the attention of the trial court.' " *People v. Eppinger*, 2013 IL 114121, ¶ 18, 984 N.E.2d 475 (quoting Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). Plain-error review is appropriate "when *** a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant ***." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007). The defendant bears the burden of demonstrating plain-error review is appropriate. *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). "The ultimate question of whether a forfeited claim is reviewable as plain error is a question of law that is reviewed *de novo*." *People v. Johnson*, 238 Ill. 2d 478, 485, 939 N.E.2d 475, 480 (2010).

¶ 65        Here, even assuming, *arguendo*, that the trial court committed clear or obvious error in the manner it admonished the venire pursuant to Rule 431(b), defendant has failed to demonstrate that the evidence was closely balanced. In determining whether the evidence was close, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53, 89 N.E.3d 675. Our inquiry "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 66        A.Y. testified in detail about how defendant sexually assaulted her both vaginally and anally after threatening her with a knife, while defendant merely answered "no" when asked whether he sexually assaulted her. Moreover, A.Y.'s version was corroborated by the State's propensity evidence, the discovery of defendant's semen in her vagina and anus, her "frantic" 911 call, and her statements shortly after the assault to police, her friend, and the examining nurse. On the other hand, defendant fails to point to any evidence that corroborates his version or

- 16 -

contradicts A.Y.'s version. Thus, contrary to defendant's assertion, this case did not involve a "credibility contest." See *Sebby*, 2017 IL 119445, ¶ 63 (" 'Given these opposing versions of events, *and the fact that no extrinsic evidence was presented to corroborate or contradict either version*, the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two officers against that of defendant.' " (Emphasis added.) (quoting *People v. Naylor*, 229 Ill. 2d 584, 607, 893 N.E.2d 653, 668 (2008))). As a result, we conclude defendant has failed to establish plain error and we honor his forfeiture of this argument. See *Naylor*, 229 Ill. 2d at 593 ("When a defendant fails to establish plain error, the result is that the procedural default must be honored.").

¶ 67                                III. CONCLUSION

¶ 68            For the reasons stated, we affirm the trial court's judgment.

¶ 69            Affirmed.