2020 IL App (1st) 190662

FIRST DISTRICT
THIRD DIVISION
June 30, 2020

No. 1-19-0662

| | | |
|---|---|---|
| *In re* O.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 JD 2107 |
| | ) | |
| O.F., | ) | Honorable |
| | ) | Stuart F. Lubin, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Presiding Justice Ellis and Justice McBride concurred in the judgment and opinion.

OPINION

¶ 1 Respondent, O.F., a 16-year-old, was charged with offenses to include one count of aggravated possession of a stolen motor vehicle (PSMV), where it was alleged that he was driving a stolen Jeep and failed to stop after an officer signaled. Following a bench trial, respondent was adjudicated delinquent of aggravated PSMV, and the remaining offenses were merged into the aggravated PSMV offense. The Cook County circuit court sentenced respondent to commitment at the Department of Juvenile Justice until his twenty-first birthday. Respondent filed a direct appeal from the judgment of the trial court arguing (1) that his delinquency adjudication should be overturned because the State failed to prove him delinquent beyond a reasonable doubt where it failed to prove respondent was the offender driving the stolen Jeep and (2) in the alternative that his delinquent adjudication should be reduced from aggravated PSMV to PSMV because the State failed to prove beyond a reasonable doubt that the officer who

signaled the Jeep to stop displayed red or blue lights and thus failed to prove an element of aggravated PSMV. For the following reasons, we reverse.

¶ 2                                   BACKGROUND

¶ 3      Following a bench trial, respondent was found adjudicated delinquent of one count of aggravated PSMV (625 ILCS 5/4-103.2(a)(7)(A) (West 2018)); one count of PSMV (625 ILCS 5/4-103(a)(1) (West 2018)); and one count of fleeing or attempting to elude a peace officer (625 ILCS 5/11-204 (West 2018)). The trial court sentenced respondent to commitment at the Department of Juvenile Justice until his twenty-first birthday on the aggravated PSMV charge, and the two remaining offenses were merged into the aggravated PSMV offense.

¶ 4                                       Trial

¶ 5                          Testimony of Christina Velazquez

¶ 6      At trial, Christina Velazquez testified she owned a gray 2016 Jeep Patriot with license plate AR89926, which she reported stolen after it was taken from outside her apartment complex located on the 1700 block of Barrett in North Chicago on December 24, 2018. Velazquez testified she did not know respondent, nor did she give him or anyone else permission to possess her car.

¶ 7                          Testimony of Officer Brian Dorsch

¶ 8      Officer Brian Dorsch testified he worked for the Chicago Police Department (CPD) for 22 years. On December 27, 2018, he was on duty investigating an unrelated burglary in plain clothes and an unmarked police vehicle. His vehicle was not equipped with a dash cam. Dorsch was in the area of North and Laramie Avenues in Chicago at approximately 10:42 a.m. He testified the weather was cloudy that day with a "light drizzle," "light rain." He was heading northbound on Laramie when he saw a dark-colored Jeep Patriot. Dorsch testified the vehicle did

not initially catch his attention because it was going to travel the same direction as him. Dorsch testified that, as the Jeep was coming toward him, he observed the driver of the vehicle, whom he identified as respondent. He made eye contact with the driver and was able to see the driver's face but was only able to see the driver from the chest up. The Jeep then made a left turn into an alley of North Avenue in front of Dorsch, where he viewed the driver through the passenger's side window of the Jeep. The Jeep was 10 to 15 feet away from Dorsch's vehicle.

¶ 9    Dorsch's burglary investigation required him to turn right into the same alley. Dorsch testified that it was after the vehicle turned left and Dorsch was following the Jeep down the alley that the vehicle ultimately "did catch [his] attention because it started accelerating a little bit away from [him]." Dorsch continued following the Jeep down the alley, as it turned on Saint Paul Avenue, then onto LeClaire Avenue, at which point the Jeep started to accelerate "extremely fast." Dorsch testified that at this point he was following the Jeep without pursuing. He continued to follow the Jeep down another alley and then onto Grand Avenue. Dorsch got closer to the Jeep and checked the license plate through dispatch, who informed him the car had been reported stolen. Upon receipt of this information, Dorsch testified he activated his lights in attempt to stop the vehicle but the Jeep did not come to a stop. Dorsch testified that he continued to pursue the Jeep down Grand, eventually turning on LeClaire, driving north on LeClaire over 500 feet, then turning on Palmer Street. "Prior to [Dorsch] getting to Palmer the supervisor told [him] to stop following the vehicle" pursuant to CPD protocol for the safety of the officer and general public. The Jeep did not stop. Dorsch followed the Jeep down Palmer and saw it turn into an alley, which Dorsch passed and lost visual contact. During this time, Dorsch was in radio contact with other officers in the area informing them of the Jeep's location.

¶ 10    Dorsch testified the next time he saw respondent was when he ran directly in front of Dorsch's vehicle. He was able to identify respondent as the individual that had been driving the Jeep based on his face. Dorsch testified respondent was wearing a "[d]ark hooded sweatshirt with this white or light colored striped dark pants." He notified the other officers of respondent's location but lost visual contact around 2130 LaPorte Avenue.

¶ 11    Dorsch saw respondent again when he "pop[ped] out of a gangway" but testified that his clothing had changed; "[t]his time he did not have his hoodie." Dorsch identified respondent as the driver of the Jeep. Dorsch again lost visual contact of respondent. The next time Dorsch saw respondent was after he had been arrested by another police unit and Dorsch, where he identified respondent as the driver of the Jeep. He processed respondent and learned that the arrest took place on the same block as respondent's residence.

¶ 12                          Testimony of Officer Mark Kushiner

¶ 13    Officer Kushiner testified he was looking for the fleeing driver of the Jeep whom he had received a description of from Dorsch over the radio. He saw someone matching that description being detained by another officer. Kushiner identified the individual being detained as respondent. Kushiner testified he asked Dorsch to "identify the defendant as the person he saw driving that [Jeep]." However in State's exhibit 2 introduced into evidence, containing the video from Kushiner's body camera of Dorsch's identification of respondent, Kushiner stated "[Dorsch] you want to get a look at him?" to which Dorsch responded "Good" after which Kushiner confirmed for the officers detaining respondent that Dorsch had identified respondent as the driver of the Jeep. Respondent was then placed in a CPD vehicle. The video indicated the time was approximately 4:42 p.m.

¶ 14                          Testimony of Officer Cerceja

¶ 15    Officer Cerceja testified she and her partner were driving in the area of Laramie and Palmer and saw someone matching the description of a suspect coming out of an alley. She testified that they began driving alongside that person, whom she identified as respondent. Cerceja testified that her partner opened the car window and engaged in conversation with respondent and "he said he would come here; something like that." Cerceja called for backup. She testified that respondent "made eye contact with us, and then he started running southbound on Lavergne." The backup officers arrived at the location and detained respondent.

¶ 16    The trial court found respondent delinquent on all charges and merged the lesser two charges into the aggravated PSMV charge. In its reasoning, the trial court stated:

> "Officer Dorsch testified *** [h]e saw the [respondent] driving this jeep that turned right in front of him. He ran the plate; it was a stolen car. He continued to follow the vehicle. *** He heard the beeps which were associated with the body cam, but he also testified that you hear the same beeps with the lighted bar.
>
> The [respondent] accelerated, [Dorsch] followed. Once he realized that it was a stolen car, he turned his lights and siren on. The [respondent] accelerated away from him.
>
> * * *
>
> Officer Kushiner testified that *** Officer Dorsch was looking for the driver who fled this car. The [respondent] matched the description. Officer Dorsch made the out-of-court identification.
>
> And Officer Cerceja testified that they were driving alongside the [respondent]. They made eye contact and then he fled from them, which shows the [respondent's] consciousness of guilt."

¶ 17    The trial court sentenced respondent to commitment in the Department of Juvenile Justice until age 21.

¶ 18    Respondent timely filed a direct appeal from the trial court's judgment.

¶ 19    This appeal followed.

¶ 20                                ANALYSIS

¶ 21    Respondent raises two issues on appeal. Respondent first argues his delinquency adjudication should be overturned because the State failed to prove him delinquent beyond a reasonable doubt where it failed to prove respondent was the offender driving the stolen Jeep. In the alternative, respondent next argues his delinquency adjudication should be reduced from aggravated PSMV to PSMV because the State failed to prove beyond a reasonable doubt that the officer who signaled the Jeep to stop displayed red or blue lights and thus failed to prove an element of aggravated PSMV.

¶ 22                            Standard of Review

¶ 23    Respondent's first issue raised on appeal deals with the sufficiency of the evidence— whether the State proved respondent was the driver of the Jeep.

¶ 24     "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, in viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution; however, where "only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The critical inquiry is whether the record evidence

could reasonably support a finding of guilty beyond a reasonable doubt. *Wheeler*, 226 Ill. 2d at 114. A reviewing court

> "will not retry a defendant when considering a sufficiency of the evidence challenge. [Citation.] The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court *** that saw and heard the witnesses. [Citation.] Accordingly, a [trial court's] findings concerning credibility are entitled to great weight. [Citation.]" *Id.* at 114-15.

¶ 25    That a trial judge accepts the veracity of certain testimony does not, however, guarantee reasonableness and is neither conclusive nor binding, though "a fact finder's decision to accept testimony is entitled to deference." *Id.* at 115. Further, it is for the fact finder to judge how flaws or contradictions on the part of a witness's testimony affect the credibility of the testimony in its totality. *Cunningham*, 212 Ill. 2d at 283. "Accordingly, a conviction will [only] be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Wheeler*, 226 Ill. 2d at 115.

¶ 26    Having established the appropriate standard of review, we now turn to the merits of respondent's appeal.

¶ 27              Proof Respondent was the Driver of the Stolen Jeep

¶ 28    Respondent was found delinquent of aggravated PSMV (625 ILCS 5/4-103.2(a)(7)(A) (West 2018)). Section 4-103.2(a)(7)(A) of the Illinois Vehicle Code (Code) provides for aggravated offenses relating to motor vehicles and states as follows:

> "(a) Except as provided in subsection (a-1), it is a violation of this Chapter for:

* * *

(7) a person:

(A) who is the driver or operator of a vehicle and is not entitled to the possession of that vehicle and who knows the vehicle is stolen or converted, ***

***

who has been given a signal by a peace officer directing him to bring the vehicle to a stop, to willfully fail or refuse to obey such direction, increase his speed, extinguish his lights or otherwise flee or attempt to elude the officer. The signal given by the peace officer may be by hand, voice, siren, or red or blue light. The officer giving the signal, if driving a vehicle, shall display the vehicle's illuminated, oscillating, rotating or flashing red or blue lights, which when used in conjunction with an audible horn or siren would indicate that the vehicle is an official police vehicle." 625 ILCS 5/4-103.2(a)(7)(A) (West 2018).

¶ 29    Here, where the finding of delinquency depends on eyewitness testimony, a "reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 279. Vague or doubtful identifications will not support a conviction; however, a single witness's identification of the accused is sufficient to sustain a conviction. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). "An identification may be positive even though the witness viewed the accused for a short period of time," and "[t]he sufficiency of the opportunity to observe is for the trier of fact to determine." *People v. Wehrwein*, 190 Ill. App. 3d 35, 39-40 (1989).

¶ 30    Given Dorsch's testimony and in considering the totality of the circumstances, we conclude the evidence is insufficient to identify the respondent as the individual driving the stolen vehicle beyond a reasonable doubt.

¶ 31    In assessing the circumstances to be considered in evaluating identification testimony, our supreme court has adopted the guidelines set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), which requires assessment of the following factors:

> "(1) the opportunity the [witness] had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the [witness] at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-08.

¶ 32    The first factor is the "most important" factor (*Wehrwein*, 190 Ill. App. 3d at 39); however, *Biggers* instructs that all factors are to be considered with no single factor conclusively establishing the reliability of identification testimony. *Biggers*, 409 U.S. at 199-200. We are cognizant of the authorities and cases cited by respondent questioning the reliability of certain eyewitness identifications. Our supreme court acknowledged in *People v. Lerma*, 2016 IL 118496, ¶ 24, "that eyewitness misidentification 'is now the single greatest source of wrongful convictions in the United States, responsible for more wrongful convictions than all other causes combined' " (quoting *State v. Dubose*. 699 N.W.2d 582, 591-92 (Wis. 2005)). Even without considering the substantial literature on eyewitness misidentification, given the evidence alone, we cannot find Officer Dorsch's eyewitness testimony could be reasonably accepted as proof beyond a reasonable doubt.

¶ 33                            Officer Dorsch's Opportunity to View

¶ 34    We begin our analysis of the reliability of Officer Dorsch's identification with the first and most important *Biggers* factor: the opportunity the witness had to view the criminal at the time of the crime. *Wehrwein*, 190 Ill. App. 3d at 39. We find that this factor weighs in respondent's favor.

¶ 35    We note here that Dorsch was the only witness who had an opportunity to view the driver of the Jeep. Furthermore, Dorsch himself only had one opportunity to view the driver of the Jeep. The viewing lasted just moments and occurred in less than ideal circumstances.

¶ 36    Our difficulty with Dorsch's opportunity to view begins with his poor vantage point during the viewing of the driver. It occurred as the Jeep was in motion driving toward Dorsch from the northbound lane and then shifted to the Jeep's passenger side window as the vehicle turned from a distance of 10 to 15 feet away. Dorsch's vehicle, which he was driving, was also in motion during the entire viewing. Given the trajectory of the vehicle in relation to Dorsch, the 10- to 15-foot distance would have been the closest the Jeep ever would have gotten to Dorsch, such that the earlier head-on views would have been from an even greater distance.

¶ 37    Further impacting Dorsch's viewing opportunity was the fact that it was raining at the time. We recognize the viewing occurred at approximately 10:42 a.m.; however, this was not a bright, clear day. Dorsch testified it was cloudy and there was a light rain. Common sense dictates that even a light rain on a cloudy day would impact the line of sight from a distance of 10 to 15 feet away and certainly at distances beyond that. Moreover, vehicles have glass windows, and as it was raining, rainwater would necessarily have accumulated on the glass of the Jeep's windows and Dorsch's front windshield, impairing the viewing opportunity even with windshield wipers activated. While there is nothing in the record concerning the activation of either vehicle's windshield wipers, we note that activated windshield wipers create a distraction

and impediment that would not necessarily enhance the viewing circumstances. Moreover, there are no windshield wipers on the side windows of a vehicle to remove the rainwater that would have accumulated on the Jeep's passenger side door, further impeding Dorsch's view as the Jeep turned into the alley.

¶ 38    Finally, Dorsch testified he was only able to view the driver in the Jeep from the chest up. As a result, the opportunity to view was devoid of physical attributes such as the individual's clothing, height, and weight upon which the viewer can seize to aid an identification. This is particularly relevant where, as is the case here, the identification was from a distance that would obscure the finer details of a person's facial features that might be used to bolster such an identification. On this point, Dorsch's identification testimony merely evidences that he saw the driver's face and made eye contact, identifying no distinguishing characteristics. We find this lack of specification particularly troubling given our conclusion as to the other *Biggers* factors, particularly, Dorsch's degree of attention, as we will discuss below.

¶ 39    We are cognizant of the cases cited by the State affirming convictions based on eyewitness identifications that occurred over a short period of time, from an equivalent or greater distance, or by a single witness, but we find those cases can be distinguished from this case. See *Slim*, 127 Ill. 3d at 311 (affirming eyewitness identification where, though the only eyewitness, actual victim of the robbery at issue was that witness, the witness was standing face-to-face only one or two feet away at the time of the robbery and continued to view the robber's face as he backed away 10 to 15 feet, and the witness had an unimpeded opportunity to view the robber under well-illuminated conditions); see also *People v. Macklin*, 2019 IL App (1st) 161165, ¶¶ 28-30 (affirming eyewitness identification that lasted seconds but where there were two eyewitnesses who identified the defendant, the defendant's face and body were not obscured,

there was sufficient artificial lighting, and the eyewitnesses were paying attention as the defendant approached them on foot); *People v. Anderson*, 2017 IL App (1st) 122640, ¶¶ 41-42 (affirming identification from 10 to 12 feet away for a brief period of time, but there were two eyewitnesses, the viewing occurred in a well-lit ally where the witnesses had an unobstructed view of the defendant's entire person, and the description of the defendant given over the radio was accurate with an identification being made minutes later).

¶ 40    Nevertheless, as noted in *Macklin*, 2019 IL App (1st) 161165, ¶ 34, cited by the State, "each case must be judged on its own facts." Based on the record before us, we conclude that this *Biggers* factor weighs in favor of respondent.

¶ 41                         Officer Dorsch's Degree of Attention

¶ 42    We also find the second of the *Biggers* factors—Officer Dorsch's degree of attention— weighs in favor of respondent.

¶ 43    As previously noted, Dorsch only had one opportunity to view the driver of the Jeep, in unfavorable conditions. Our difficulty with the reliability of Dorsch's eyewitness identification is further complicated by Dorsch's self-described lack of attention to the Jeep in the moments he had to view the driver within.

¶ 44    Most significantly, Dorsch specifically testified the Jeep had not caught his attention until after it turned left and Dorsch was following the vehicle from behind. It was only when Dorsch was behind the vehicle and it began to speed up that Dorsch testified the Jeep finally caught his attention. Thus, Dorsch's eye contact with the driver and opportunity to view his face occurred at a time when Dorsch's attention was directed elsewhere, and this was the only opportunity Dorsch had to view the driver of the Jeep.

¶ 45    On top of this, Dorsch testified there was nothing special about the Jeep that made him follow the vehicle. In fact, the only reason Dorsch did so was because he was in the midst of a burglary investigation requiring him to turn right into the same alley. Dorsch specifically testified that the reason the Jeep did not catch his attention was because Dorsch was going to travel in that same direction.

¶ 46    Additionally, the fact that both Dorsch's vehicle and the Jeep were in motion during the entire viewing necessarily further detracts from the level of attention Dorsch could direct to the viewing of the Jeep's driver. Accordingly, we find this factor weighs heavily in respondent's favor and when coupled with Dorsch's poor opportunity to view becomes particularly damning.

¶ 47                    Accuracy of Officer Dorsch's Prior Description

¶ 48    As to the accuracy of Officer Dorsch's prior description of respondent, we find this factor weighs in favor of respondent. As respondent acknowledges, at trial

> "Dorsch failed to give any description of the person he saw driving the Jeep. [Citation.] In fact, the State presented no evidence of the race, sex, age, height, weight, hair color, or hair style of the person Dorsch saw driving the Jeep. Thus, no comparison can be made between the appearance of the driver and either the person Dorsch later saw on foot or [respondent's] appearance at the time Dorsch identified him at the show-up."

¶ 49    As explained above, there are significant issues with Dorsch's suboptimal viewing of the Jeep's driver. Adding to the problematic identification is the fact that there is absolutely no testimony in the record from Dorsch detailing the description of the individual he observed, albeit from the chest up, driving the Jeep. Furthermore, no officer testified about the description of the Jeep's driver they received from Dorsch. As a result, we are unable to compare for

accuracy the description on which respondent's arrest was based, further weakening the identification.

¶ 50    While there was no testimony concerning any description provided of the Jeep's driver, Dorsch did provide a description at trial of the individual he later observed on foot, whom he identified as the Jeep's driver, which is also problematic. Significantly, that description was inconsistent with respondent's appearance at the time of his arrest. Dorsch was asked what respondent was wearing when Dorsch first saw respondent on foot. Dorsch testified respondent was wearing a "dark hooded sweatshirt with this white or light colored striped dark pants." However, Dorsch's "clothing descriptions of the person on foot do not accurately describe [respondent's] appearance when he was detained and identified in the show-up." When respondent was detained and Dorsch identified him as the Jeep's driver, respondent "was wearing a black sweatshirt, with no hood and the word 'Champion' written on it in white lettering; and solid black pants with a 'C' on the left thigh." We recognize that Dorsch testified respondent removed his hoodie at some point, but this does not cure all the inconsistencies. We are cognizant of courts that have affirmed identifications where there is a variance in the clothing. However, in this case, the absence in the record of any physical description of the Jeep's driver by Dorsch, combined with the variance in the clothing description, detracts from our confidence in Dorsch's identification of respondent. We weigh this factor in favor of respondent.

¶ 51                    Officer Dorsch's Level of Certainty

¶ 52    We find that the factor of Officer Dorsch's level of certainty tilts slightly against respondent. As the State points out, Dorsch did not equivocate in his belief that respondent was

the driver of the Jeep. However, Dorsch's only testimony linking the driver of the Jeep to respondent is as follows:

> "Q. And then when you saw this person running in the area of Waller in the alley, were you able to identify that person as the person who's driving the [Jeep]?
>
> A. Yes.
>
> Q. And how were you able to do that?
>
> A. Face."

¶ 53    While clear and unequivocal, this testimony does not exactly instill confidence and certainly does not overcome the serious deficiencies identified with Dorsch's level of attention and opportunity to view the driver of the Jeep in the first place. Further adding to the unreliability of this identification is that it was accomplished by way of a show-up such that respondent was standing alone in police custody when the identification was made. As our supreme court has observed, such show-ups carry a dangerous degree of improper suggestion leading to unreliable identifications. *People v. Blumenshine*, 42 Ill. 2d 508, 512 (1969). Thus, we weigh this factor in favor of respondent.

¶ 54    The Time Between the Crime and Officer Dorsch's Identification Confrontation

¶ 55    The factor concerning the time between the crime and Officer Dorsch's identification of respondent weighs against respondent. Here respondent concedes "that it was likely a short period of time between when Dorsch saw the Jeep and identified [respondent] in the show-up." The record confirms that the entire incident lasted no more than six hours. However, as with the previous factor, the short timeframe between the initial viewing of the Jeep's driver and respondent's ultimate arrest does nothing to alleviate the issues with the viewing of the Jeep's

driver. Where we cannot reasonably accept that there was sufficient level of attention or opportunity to view the driver of the Jeep by Dorsch, it is of little consequence that the arrest took place only hours after the initial sighting. We note that our conclusion here is only bolstered by the fact that respondent had every reason to be in the vicinity of the arrest. As Dorsch testified, respondent's house was located on the very block on which he was arrested.

¶ 56    After an analysis of all the *Biggers* factors we conclude that Dorsch's identification testimony is unreliable. The most significant *Biggers* factor, Dorsch's opportunity to view, compounded by Dorsch's lack of attention during the viewing, casts serious doubt on the identification here, which we deem insufficient to support respondent's delinquency adjudication. See *Slim*, 127 Ill. 2d at 307. Compounding this unreliable identification is the fact that the record is devoid of any physical evidence connecting respondent to the offense. Accordingly, we find the trial court could not have reasonably accepted Dorsch's testimony that respondent was the person he saw driving the Jeep and find the evidence, which rests exclusively on Dorsch's eyewitness testimony, so unreasonable, improbable, and unsatisfactory that it justifies a reasonable doubt as to respondent's guilt. See *Wheeler*, 226 Ill. 2d at 115.

¶ 57    Our conclusion here makes it unnecessary for us to consider respondent's alternative argument of error on appeal. See *People v. Coulson*, 13 Ill. 2d 290, 298 (1958) (declining to consider other alleged errors on appeal because the evidence of the only witness to the offense at issue was deemed too improbable and unconvincing to sustain the conviction).

¶ 58                                  CONCLUSION

¶ 59    For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

¶ 60    Reversed.

**No. 1-19-0662**

| | |
|---|---|
| **Cite as:** | *In re O.F.*, 2020 IL App (1st) 190662 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-JD-2107; the Hon. Stuart F. Lubin, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Erin Sostock, of State Appellate Defender's Office, of counsel), for the People. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia, and Justin Erb, Assistant State's Attorneys, of counsel), for the People. |