2021 IL App (1st) 190590-U

SIXTH DIVISION
May 21, 2021

No. 1-19-0590

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 20279 (02) |
| | ) | |
| ANTOINE REYNOLDS, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for first degree murder is affirmed where a reasonable juror could find eyewitness identifications of defendant as the shooter were reliable.

¶ 2    A jury found defendant Antoine Reynolds guilty of first degree murder, and the trial court sentenced him to 50 years in prison. On appeal, Mr. Reynolds argues that the evidence at trial was insufficient to support his conviction because the testimony of the two eyewitnesses who identified him as the shooter was too unreliable. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    Mr. Reynolds and his codefendant Marlon Boyce were tried in severed but simultaneous

jury trials. The evidence presented at the trials was that, at approximately 6:22 p.m. on July 6, 2011, a group of people had congregated on the corner of 61st Street and Normal Boulevard in Chicago when a gold Cadillac pulled up alongside them and one or more individuals inside the vehicle began shooting at the group. Davonta Childress and Michael Barnes were both shot, and Mr. Childress died as a result of his wounds. The State's theory at trial was that Mr. Boyce was the driver of the Cadillac and Mr. Reynolds fired a gun from the backseat of the car.

¶ 5    The police investigated the shooting the night it occurred. That night, no one identified the backseat shooter, though one witness—Michael Barnes—identified the driver as Mr. Boyce. Then, two years later, the case was reopened, and four eyewitnesses identified Mr. Boyce as the driver, while two of those four identified Mr. Reynolds as the backseat shooter. At the trial, those two eyewitnesses, Terry Butler and Calvin Garrett, again identified Mr. Reynolds as the backseat shooter and Mr. Boyce as the driver of the Cadillac. Kenyatta Barnes and Michael Barnes, the two other eyewitnesses who had identified Mr. Boyce as the driver, said at trial that they could recall neither the shooting nor their earlier cooperation with the police investigation. No physical evidence connecting Mr. Reynolds to the shooting was recovered from the scene. The testimony of each of the witnesses as well as any other significant evidence that was introduced at trial is outlined below.

¶ 6                              A. Terry Butler

¶ 7    Terry Butler, the State's primary identification witness, acknowledged that he was a convicted felon: he had prior convictions for possession of a fraudulent ID, unlawful use of a weapon, and aggravated unlawful use of a weapon.

¶ 8    Mr. Butler testified that, at approximately 6:22 p.m. on July 6, 2011, he was standing with a group of approximately 15 people that had congregated on the southeast corner of 61st Street

and Normal Boulevard. The group included Davonta Childress, Michael Barnes, Terrell Barnes, and Kenyatta Barnes.

¶ 9    At some point, Mr. Butler saw Mr. Boyce driving a gold Cadillac south on Normal Boulevard, a two-way street. Mr. Butler explained that he had known Mr. Boyce "[a]ll [his] life" from around the neighborhood. Mr. Butler said that Mr. Boyce "swerved" onto their side of the street, into the northbound lane. Mr. Butler said he saw two people in the Cadillac—the driver and a passenger in the rear driver-side seat. Mr. Butler did not initially see the person in the back, but then Mr. Butler saw him "lift up out of the back seat and start shooting."

¶ 10    Mr. Butler identified the second man as "Antonio" Reynolds, who Mr. Butler had known, through Mr. Boyce, for approximately two years. Mr. Butler testified that he had never "hung out" with Mr. Reynolds but had had conversations with him on multiple occasions.

¶ 11    Mr. Butler testified that he saw Mr. Reynolds "raise up out of the back seat from the laying-down position" and then Mr. Reynolds started shooting a large gun, like a "machine gun." When the shooting—which Mr. Butler described as 15 to 20 "[r]apid fire" shots—began, Mr. Butler turned around and started running, then fell and stayed on the ground. Mr. Butler said he also heard a different set of shots that sounded to him as though they were fired from a handgun but did not see who fired those shots.

¶ 12    Once the shooting stopped and Mr. Boyce drove away, Mr. Butler got off the ground and ran to the back of the building the group had been standing in front of, where he saw that Michael Barnes had been shot in the leg.

¶ 13    Although Mr. Butler had not been hit directly during the shooting, a bullet had ricocheted off a building and hit his foot. Mr. Butler went to the hospital for treatment and spoke with police there briefly. Mr. Butler said he told the police he did not know what happened or the names of

anyone who had done the shooting. Mr. Butler explained at trial that this was because "[he] was scared."

¶ 14    Mr. Butler testified that on July 29, 2014, more than three years later, he was being held in Cook County Jail on an unrelated felony gun charge when detectives came to see him. They took Mr. Butler to the police station where he had a conversation with Detective Arteaga. After Mr. Butler had identified Mr. Boyce from a photo array as the driver of the Cadillac, Mr. Butler told the detective that he also knew who the backseat shooter was and identified him as "Antonio." Mr. Butler testified that Detective Arteaga showed him a photo that Mr. Butler confirmed was the person he knew as Antonio. Mr. Butler testified that Detective Arteaga showed him a printed photo of Mr. Reynolds, not a photo on a computer screen.

¶ 15    The following day, July 30, 2014, Mr. Butler testified before the grand jury. He again identified the photo of Mr. Reynolds as the person he knew as "Antonio" and who was the backseat shooter. He also identified a photo of Mr. Boyce as the driver. Mr. Butler also identified both men in open court.

¶ 16    On cross-examination, Mr. Butler testified he did not remember at exactly what time the shooting occurred, but that "it was light outside," and he had not been smoking marijuana or drinking alcohol. Mr. Butler elaborated by describing the scene that unfolded as "kind of like slow motion. As the car pulled on our side, guy popped up, I seen him, he seen me, then he start[ed] shooting." He acknowledged that he only saw a few seconds of the shooting and most of that was from the ground where he had fallen while running away.

¶ 17    Mr. Butler also acknowledged that, when the police spoke to him at the hospital the night of the shooting, he did not provide any description of the backseat shooter, did not say anything about a large machine-type gun being used, and did not say that he knew the identity of the shooter.

Mr. Butler testified that when he spoke with Detective Arteaga in 2014 about Mr. Reynolds, he did not believe he gave a last name.

¶ 18    Mr. Butler also acknowledged on cross-examination that he had used a false name, which is why he was convicted of possession of a fraudulent ID, and that was a crime of dishonesty. After speaking with Detective Arteaga in 2014, Mr. Butler received the minimum sentence for the aggravated unlawful use of a weapon charge he was facing.

¶ 19    Detective Arteaga confirmed some of what Mr. Butler testified to about their conversation on July 29, 2014, but also contradicted him in places. Detective Arteaga testified that Mr. Butler identified the person in the backseat as "Antonio Reynolds." Detective Arteaga did some research and found an Antoine Reynolds who lived a few blocks from where the shooting occurred and brought his photo up on the computer. Detective Arteaga said that when Mr. Butler saw the picture of Mr. Reynolds on the computer, "he actually pointed to the computer and said that's him."

¶ 20    On cross-examination, Detective Arteaga agreed that although Mr. Butler had identified Mr. Boyce by name, he still showed Mr. Butler a photo array with Mr. Boyce in it, but that he did not show Mr. Butler a photo array with Mr. Reynolds in it, explaining, "[i]t really wouldn't make sense. He identified him and said he knew him for a very long time and identified him by name." The detective agreed that he could have done a photo array for Mr. Reynolds but chose not to.

¶ 21                                B. Calvin Garrett

¶ 22    Calvin Garrett, the only other witness to identify Mr. Reynolds, also acknowledged on the stand that he was a convicted felon with two prior felony convictions for reckless discharge. At the time of trial, Mr. Garrett was also facing a charge of felony identity theft.

¶ 23    Mr. Garrett testified that he had known Mr. Childress for approximately two years from the neighborhood. On July 6, 2011, Mr. Garrett was driving his pickup truck when he saw Mr.

Childress standing with a group at the intersection of 61st Street and Normal Boulevard. Mr. Childress stopped him to talk, and Mr. Garrett stopped his truck on the opposite side of the street from where the group was standing, staying in his truck. As Mr. Garrett and Mr. Childress were talking, Mr. Garrett saw a gold Cadillac pull up between his truck and Mr. Childress, though Mr. Garrett was still able to see Mr. Childress on the corner.

¶ 24    Mr. Garrett testified that there were two people in the Cadillac: the driver and a passenger in the backseat on the driver's side. When the Cadillac arrived, Mr. Garrett said what happened was "[j]ust shots. A lot of, well, gunshots came from the back." Mr. Garrett said the back passenger began shooting toward Mr. Childress and the other people on the corner with an assault rifle. Mr. Garrett saw Mr. Childress get struck with a bullet in the pelvic area, then fall. Although Mr. Garrett did not see anyone else in the Cadillac firing a weapon, he said "[i]t sounded like a second gun that went off" from the car.

¶ 25    Mr. Garrett said the shooting lasted a "[c]ouple seconds. It was quick." But before the Cadillac sped away, Mr. Garrett was able to see the driver and recognized him from the area as "Marlon." Mr. Garrett did not recognize the person in the back and had never seen that person before. After the Cadillac was gone, Mr. Garrett took Mr. Childress to the hospital.

¶ 26    Mr. Garrett testified that he met with two detectives at his home on July 8, 2011, and told them that he did not know who committed the shooting. Mr. Garrett explained that he did so "[b]ecause [he] was scared and [he] didn't want anything—[he] didn't want to have anything to do with it."

¶ 27    The next time Mr. Garrett spoke with the police about the shooting was January 27, 2014, at the police station. Detective Arteaga asked Mr. Garrett about the shooting, and Mr. Garrett then told the detective that he was able to see the driver of the Cadillac. Detective Arteaga showed Mr.

Garrett a group of photos and asked whether Mr. Garrett recognized anyone, and Mr. Garrett identified one photo as the driver of the car, a person he knew by the name "Marlon." This was Mr. Boyce.

¶ 28    On January 30, 2014, Mr. Garrett testified before the grand jury and again identified the picture of Mr. Boyce from the photo array as being the driver. He did not identify Mr. Reynolds at that time, and the parties stipulated that at the grand jury Mr. Garrett was asked "[d]id you get a good look at the passenger?" and answered, "[n]o, I did not see the passenger." Mr. Garrett did not recall this but did recall testifying before the grand jury that the rear shooter "had a black hoodie over his head, so I couldn't see his face."

¶ 29    According to Mr. Garrett's testimony, he then returned to the police station on October 3, 2014, where he identified Mr. Reynolds as the individual who was in the back seat, for the first time, from an in-person lineup. Mr. Garrett testified that when he viewed the lineup, he was asked whether he recognized anyone from the night of the shooting. Mr. Garrett said he recognized one person, "from a glimpse of the face, but that's it." He explained, "I didn't really know exactly who this guy is. I don't know this guy, never seen this guy."

¶ 30    Mr. Garrett identified both Mr. Reynolds and Mr. Boyce in open court.

¶ 31    On cross-examination, Mr. Garrett said he parked his car on Normal Boulevard at the stop sign at the northwest corner of the intersection and that he never told the detectives he was facing west on 61st Street when the shooting occurred. Mr. Garrett said that when he spoke to the police on the night of the shooting, he did give the officers a description of the vehicle but did not provide a description of the shooters, and he did not give a description of the shooters when he met with the detectives on July 8, 2011.

¶ 32    Mr. Garrett also said on cross-examination that when he finally identified Mr. Reynolds on

October 3, 2014, Detective Arteaga did not read him any advisory admonishments that the suspect may or may not be in the lineup and that he was not required to make an identification. He also agreed that only one of the five men in the in-person lineup had face tattoos, and that was Mr. Reynolds.

¶ 33    Mr. Garrett agreed he had been arrested a few times before and that he knew shoelaces and jewelry are removed as part of the arrest process. The following exchange then occurred:

"[DEFENSE COUNSEL] [Q.] Two of the five people in the lineup didn't have shoelaces in their shoes, correct?

[MR. GARRETT] A. Correct.

Q. And three people did have shoelaces in their shoes, correct?

A. No.

Q. Some of the people that were participating in the lineup did have shoelaces in their shoes, correct?

A. No. When you're in a lineup, you don't have shoelaces.

* * *

Q. But some people in this lineup were wearing shoelaces, correct?

A. No."

¶ 34    Defense counsel then showed Mr. Garrett a photo of the in-person lineup he had viewed, and after looking at the picture, Mr. Garrett agreed that some of the people in the lineup had shoelaces in their shoes, while the person Mr. Garrett picked out did not have shoelaces. Mr. Garrett also agreed that a man in the lineup with shoelaces was also wearing a watch, another man was over six feet tall, and a third was "pretty young."

¶ 35    Mr. Garrett said he was able to pick Mr. Reynolds from the lineup as the shooter because

he had a "glimpse of the side" of the shooter's face. Mr. Garrett also agreed that in the lineup, Mr. Reynolds had some facial hair and face tattoos, but that he had not told anyone before that the shooter had either of those features.

¶ 36    On redirect, Mr. Garrett testified that he had not picked Mr. Reynolds out of the lineup because of a face tattoo, his lack of shoelaces, or his lack of jewelry—Mr. Garrett picked out Mr. Reynolds because he had seen a "glimpse" of the "right side" of his face. Mr. Garrett did not know how tall Mr. Reynolds was when he was sitting in the back of the Cadillac.

¶ 37    Detective Devi Medina testified to her conversation with Mr. Garrett, saying she met him on the night of the shooting and again on the day after. On the night of the shooting, Mr. Garrett told Detective Medina that he saw two people wearing white t-shirts in the Cadillac, but that he did not think he could make an identification. On July 7, Mr. Garrett again told the detective that he had not seen the occupants of the Cadillac, but knew they were wearing white t-shirts. Mr. Garrett also told Detective Medina that he had slid down into his truck when the shooting started.

¶ 38    Detective Arteaga testified that on October 3, 2014, before Mr. Garrett viewed the in-person lineup, he gave Mr. Garrett admonishments and Mr. Garrett signed a lineup/photo array advisory form, but the form had been lost. The detective said Mr. Garrett identified Mr. Reynolds as the person who was in the back of the Cadillac, who was lying down then sat up and started shooting what looked like a machine gun.

¶ 39    On cross-examination, Detective Arteaga said that, on January 27, 2014, Mr. Garrett also said he saw the backseat shooter but did not know him by name and did not provide any description. Mr. Garrett said he was facing westbound on the day of the shooting, and when the shooting started, he slid down in the truck.

¶ 40    Detective Arteaga testified that when Mr. Reynolds was arrested, he was 200 pounds, five-

feet, nine-inches tall, and 28 years old, with face tattoos. Detective Arteaga agreed that he used three police officers as fillers for the lineup. One of the officer fillers was 21 years old, five-feet, five-inches tall, and 145 pounds, and another was 42 years old, six-feet, one-inch tall, and 215 pounds. When Mr. Garrett viewed the lineup, the other detective had each lineup participant step forward one at a time. Detective Arteaga said that Mr. Garrett identified Mr. Reynolds as soon as Mr. Reynolds stepped forward. Detective Arteaga did not ask Mr. Garrett what level of confidence he had about the identification.

¶ 41                                  C. Kenyatta and Michael Barnes

¶ 42    Both Kenyatta and Michael Barnes testified at trial. They had never identified Mr. Reynolds, although, prior to trial, they had identified Mr. Boyce in interviews with police and before the grand jury. At trial they both mostly said, "I don't remember" in response to each question asked of them about the night of the shooting, their subsequent interviews with police, and their testimony before the grand jury. Their grand jury testimony was admitted as substantive evidence.

¶ 43    Detective Medina testified that she spoke with Kenyatta and Michael on July 8, 2011, at their home with their mother present. The detective showed Michael and Kenyatta a photo array that contained a picture of Mr. Boyce and Mr. Reynolds. Detective Medina said that at the time the photo array was created, Mr. Boyce was a suspect, but Mr. Reynolds was not. Mr. Reynolds's photo was included as "filler" to populate the array with individuals of the same approximate age and ethnic background and who were from the same approximate geographic area. According to Detective Medina, Michael identified Mr. Boyce as the driver of the gold Cadillac. Kenyatta did not make an identification at that time and said she did not recognize anyone in the photo array. Both Kenyatta and Michael said several times in their pretrial statements that they never got a good

look at the person in the backseat.

¶ 44    In their grand jury testimony, both Kenyatta and Michael said that they were part of the group hanging out on the corner of 61st Street and Normal Boulevard at approximately 6:20 p.m. on July 6, 2011. They both testified they saw a car, which Kenyatta was able to identify as a gold Cadillac, pull up close to the stop sign and stop in the middle of the intersection. They both testified that they saw three people in the car and that the driver and the rear driver-side passenger started shooting at the group on the corner. They both got a good look at the driver but not at the rear passenger. According to Michael, the driver was firing a handgun while the rear passenger was firing what looked like a machine gun.

¶ 45                             D. Other Evidence

¶ 46    Officer Barry Earls, an evidence technician with the Chicago Police Department, testified that he recovered 12 cartridge cases from the area of the shooting at approximately 7:15 p.m. that same evening. He explained that while a semiautomatic firearm would dispel cartridge cases as it was being fired, a revolver would not. On cross-examination, Officer Earls testified that there are handguns that expel cartridge casings and that the casings he collected from the scene were .40-caliber Federal, which would fit in a handgun, but not an assault rifle. Officer Earls did not see any ammunition that would have been fired from an assault rifle. On redirect examination, Officer Earls said that if a gun is fired from inside a car, it is possible the cartridge cases would then be expended back into the car.

¶ 47    The parties stipulated that the postmortem examination of Mr. Childress showed he had three wounds—a gunshot wound on his upper right thigh, with both an entrance and exit point; a gunshot wound to his upper left thigh, with both an entrance and exit point; and a graze wound on his upper right arm—and that Mr. Childress's death was caused by multiple gunshot wounds with

the manner of death being homicide.

¶ 48    The parties also stipulated that the doctor who treated Mr. Butler at the hospital on July 6, 2011, ordered a toxicology report as part of the treatment, and the test results showed the presence of both alcohol and cannabinoids in Mr. Butler's system. This contradicted Mr. Butler's claim that he had not been drinking or smoking cannabis the day of the shooting.

¶ 49                                    E. The Defense Case

¶ 50    After the State rested, Mr. Reynolds's counsel moved for a directed verdict which the trial court denied. The defense then called Chicago police officer Thomas Erlich, who testified that he spoke to Mr. Garrett at the hospital and Mr. Garrett did not give a description of the vehicle or of either offender.

¶ 51    Detective Joseph Aguirre testified in the defense case that he and his partner interviewed Mr. Garrett at Mr. Garrett's home on July 9, 2011, and, when asked whether he could identify anyone involved in the shooting, Mr. Garrett said that he could not. Mr. Garrett told the detectives that the two offenders were wearing white t-shirts and he observed a handgun come out of the window of a gold-colored Cadillac. Detective Aguirre said he did not show Mr. Garrett a photo array because Mr. Garrett said he did not see who did the shooting.

¶ 52                                    E. Verdict and Sentencing

¶ 53    The jury found Mr. Reynolds guilty of first degree murder and also found that he was armed with a firearm during the offense. Mr. Reynolds's motion for a new trial was denied.

¶ 54    The trial court sentenced Mr. Reynolds to 35 years in prison for the murder plus a 15-year mandatory firearm enhancement, for a total sentence of 50 years in prison. Mr. Reynolds's motion to reconsider his sentence was denied.

¶ 55                                    II. JURISDICTION

¶ 56    Mr. Reynolds's motion to reconsider his sentence was denied on February 28, 2019, and

he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI,

section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court

Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments

in criminal cases.

¶ 57                                     III. ANALYSIS

¶ 58    Mr. Reynolds's argument on appeal is that the eyewitness identifications were insufficient

evidence on which to find him guilty of first degree murder beyond a reasonable doubt. "When

considering a challenge to a criminal conviction based on the sufficiency of the evidence," we do

not retry the defendant. (Internal quotation marks omitted.) *People v. Swenson*, 2020 IL 124688,

¶ 35. Instead, we must determine " 'whether, after viewing the evidence in the light most favorable

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The weight to be given the witnesses'

testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the

evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the

trier of fact," and "we will not substitute our judgment for the trier of fact." *Id.* "We will not reverse

a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a

reasonable doubt of [the] defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 59    Mr. Reynolds attacks the reliability of Mr. Butler's and Mr. Garrett's identification of him

as the shooter sitting in the back seat of the Cadillac. Mr. Reynolds's argument focuses on the

following factors, which courts are directed to consider when assessing the reliability of

identification testimony, adopted from the United States Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188 (1972):

> "(1) the opportunity the [witness] had to view the criminal at the time of the crime; (2) the [witness]'s degree of attention; (3) the accuracy of the witness'[s] prior description of the criminal; (4) the level of certainty demonstrated by the [witness] at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989).

We consider the *Biggers* factors under a totality of the circumstances approach; no one factor by itself will determine whether an identification is reliable. *People v. Romero*, 384 Ill. App. 3d 125, 132 (2008).

¶ 60    In this case, we are analyzing the *Biggers* factors with respect to two identifications of Mr. Reynolds, and the issue is whether these identifications, together, were reliable enough evidence on which to sustain this verdict. See *Jackson*, 232 Ill. 2d at 281 ("The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.))

¶ 61    There are several respects in which Mr. Butler's identification of Mr. Reynolds was stronger than Mr. Garrett's; Mr. Butler knew Mr. Reynolds, identified him by name, and identified him two months earlier in the investigation. Thus, even if Mr. Garrett's identification of Mr. Reynolds was not reliable enough on its own to sustain the jury's finding that Mr. Reynolds was guilty, that identification was not the only, or even the primary, basis on which the State presented this case, nor is it the only evidence that we look to in deciding whether the record is sufficient to sustain this conviction.

¶ 62　　While we agree with Mr. Reynolds that, in the abstract, a few of the *Biggers* factors weigh in his favor, as to both of the identifications, after considering the totality of the circumstances and viewing the evidence, as we must at this point, in the light most favorable to the State, we find that the combined identifications of Mr. Reynolds as the rear passenger shooter by Mr. Butler and Mr. Garrett were sufficiently reliable to sustain the jury's finding that Mr. Reynolds was guilty of first degree murder beyond a reasonable doubt. We consider each of the *Biggers* factors and Mr. Reynolds's arguments in turn.

¶ 63　　　　　　　A. The Witnesses' Opportunity to View the Offender

¶ 64　　The first factor, the witness's opportunity to view the offender at the time of the crime, is the "most important" factor. *People v. Wehrwein*, 190 Ill. App. 3d 35, 39 (1989). And in this case, this factor weighs in favor of the State. When considering this factor, we look at "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40. Here, the shooting occurred at approximately 6:22 p.m. on July 6, 2011, and Mr. Butler testified that it was light outside. Mr. Butler said he was standing on the southeast corner of the intersection with the group that included Mr. Childress, and Mr. Garrett said he was parked across the street from the group, close enough to be talking to Mr. Childress. Mr. Butler testified that the gold Cadillac swerved onto their side of the street while Mr. Garrett said the Cadillac pulled between where he was parked and the group on the corner, placing the driver's side of the Cadillac closer to the group on the corner.

¶ 65　　This testimony was corroborated by the grand jury testimony of Kenyatta and Michael Barnes, who never identified Mr. Reynolds, but described the location of the Cadillac consistently with Mr. Garrett's testimony. Mr. Garrett also identified a photograph of the intersection that he

said accurately depicted what he could see from that vantage point, and that photograph shows that 61st Street and Normal Boulevard were both two-lane streets.

¶ 66    It is true that the length of time that Mr. Butler and Mr. Garrett had to view the driver and the rear passenger of the Cadillac was brief. Mr. Butler said he saw only a few seconds of the shooting and mostly from the ground where he fell after the first shots were fired. Mr. Garrett said the shooting lasted a "[c]ouple seconds" and that when it started, he ducked down, laying across the seat of his truck. Notably, however, Mr. Garrett was still able to observe Mr. Childress get struck by a bullet. Moreover, brevity alone is not enough to create reasonable doubt with respect to a witness's opportunity to view an offender. See, *e.g.*, *People v. Herrett*, 137 Ill. 2d 195, 204 (1990) (finding that the witness had a sufficient opportunity to view the offender where he saw the offender's face for "several seconds" in a "dim[ly]" lit shop). And "[a]n identification may be positive even though the witness viewed the accused for a short period of time." *Wehrwein*, 190 Ill. App. 3d at 39.

¶ 67    Mr. Reynolds points out that Mr. Garrett had only a "glimpse of the side" of the rear driver-side shooter's face. However, this court has upheld identifications where the witness was able to see only a portion of the offender's face. See *People v. Barnes*, 364 Ill. App. 3d 888, 894, (2006) (identification upheld where the defendant was wearing a bandana that covered the lower part of his face); *People v. Zarate*, 264 Ill. App. 3d 667, 674 (1994) (identification upheld where the defendant wore a bag with three-and-a-half-inch eye holes over his head).

¶ 68    Mr. Reynolds also argues that Kenyatta and Michael's failure to identify the backseat shooter shows just how limited the opportunity for viewing that individual was. But Kenyatta and Michael's inability to identify the rear driver-side shooter does not undermine the identifications testified to by Mr. Butler and Mr. Garrett. As is often the case, these witnesses were focused on

different people in the short time they had to observe this crime.

¶ 69                    B. The Witnesses' Degree of Attention

¶ 70    The degree of attention exercised by Mr. Butler and Mr. Garrett also weighs in the State's favor. Both witnesses provided a fair amount of detail regarding what they observed. Both testified that they saw the gold Cadillac drive up, swerve into the northbound lane, and stop by the group on the corner. Mr. Butler testified that he saw Mr. Reynolds rise up from a laying-down position, and Mr. Garrett, who was in his pickup truck, said he saw two people in the car. Both testified that they saw the backseat shooter firing a large gun—Mr. Butler described it as a machine gun and Mr. Garrett as an assault rifle. Mr. Garrett also saw Mr. Childress get shot. Both witnesses knew Mr. Childress and were necessarily engaged in watching the events unfold.

¶ 71    Mr. Reynolds argues that the witnesses' degree of attention is suspect here because "[r]esearch has shown that the presence of a weapon makes identifications less reliable." Mr. Reynolds cites *People v. Allen*, 376 Ill. App. 3d 511, 524 (2007), where the court considered a report by one expert citing studies that had found this to be true and relied on that report, in part, to find that it was improper in that case to have barred this expert testimony. Other courts have recognized that a stressful situation can increase the accuracy of an identification. See, *e.g.*, *People v. Robinson*, 206 Ill. App. 3d 1046, 1062 (1990) ("Excitement, rather than detract from an identification, could increase the powers to observe."). Indeed, Mr. Butler testified that he recalled the shooting unfold in something like "slow motion," with enough time for him to make eye contact with the backseat shooter. In short, we cannot say that the presence of guns on the scene was a basis for rejecting these identifications.

¶ 72          C. The Accuracy of the Witnesses' Prior Descriptions of the Offender

¶ 73    We agree with Mr. Reynolds that the next factor—the accuracy of the witnesses' prior

descriptions of the offender—weighs in his favor. Beyond Mr. Garrett's very general description of two unknown individuals wearing white T-shirts, neither Mr. Butler nor Mr. Garrett provided a prior description of the Cadillac's occupants. See *In re O.F.*, 2020 IL App (1st) 190662, ¶ 49 (where the witness provided no description of the offender, "we [we]re unable to compare for accuracy the description on which [the offender]'s arrest was based, further weakening the identification."). Rather, both men initially told the police they did not know who committed the shooting. But we also note that Mr. Reynolds's counsel emphasized this fact through both cross-examination and closing argument, so the jury was well aware of this weakness in the identifications.

¶ 74        D. The Degree of Certainty with Which the Identifications Were Made

¶ 75    The fourth factor again weighs in favor of the State, at least as to Mr. Butler. Mr. Butler told Detective Arteaga that he knew the backseat shooter to be "Antonio," someone he had known for two years and with whom he had had multiple conversations. According to the detective, when he pulled up Mr. Reynolds's picture on the computer, Mr. Butler "pointed to the computer and said that's him." Between Mr. Butler's prior familiarity with Mr. Reynolds and his immediate identification when he saw the picture of Mr. Reynolds, we find that his identification was reasonably certain.

¶ 76    Mr. Reynolds argues that it was inappropriately suggestive for Detective Arteaga to show Mr. Butler only one photo. But this was not a standard "one-person photo show up." Rather, the detective testified that he searched on the computer for possible suspects based on Mr. Butler saying he knew the backseat shooter was "Antonio Reynolds." These circumstances both reflect the confidence that Mr. Butler had in his identification and explain the detective's failure to use a photo array.

¶ 77    Mr. Garrett, on the other hand, did not previously know Mr. Reynolds. However, Mr. Garrett did hold firm to his testimony that when he viewed the in-person lineup, he was able to identify Mr. Reynolds. Detective Arteaga's testimony that Mr. Garrett identified Mr. Reynolds as soon as he stepped forward in the lineup also suggests a reasonable level of certainty.

¶ 78    E. The Length of Time Between the Occurrence and the Identification

¶ 79    We agree with Mr. Reynolds that the final factor, the time between the occurrence of the crime and the identification, weighs in his favor. More than three years had passed before Mr. Butler came forward and named Mr. Reynolds as the backseat shooter, and it was a couple of months later that Mr. Garrett identified Mr. Reynolds in the in-person lineup. This passage of time, though certainly relevant, "goes only to the weight of the testimony, a question for the jury, and does not destroy the witness's credibility." *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (upholding an identification where more than two years had lapsed since the time of the offense).

¶ 80    With respect to Mr. Butler in particular, this time lapse is mitigated because "[t]he persuasiveness of identification testimony is strengthened by the witness's prior acquaintance with the accused." *Barnes*, 364 Ill. App. 3d at 895. Mr. Butler had known Mr. Reynolds for two years prior to the shooting, and he had talked to him multiple times.

¶ 81    We agree with Mr. Reynolds that the three years that passed before Mr. Garrett identified Mr. Reynolds in the in-person lineup is more troubling, both because Mr. Garrett admitted he only had a "glimpse of the side" of the backseat shooter's face and because Mr. Garrett said he did not know Mr. Reynolds before the shooting. Mr. Reynolds also makes much of the fact that the three police officer "fillers" in the in-person lineup retained their shoelaces and jewelry.

¶ 82    Again, however, Mr. Reynolds's lawyer presented all of this to the jury through vigorous cross-examination of Mr. Garrett and Detective Arteaga. He also emphasized these weaknesses in

closing argument. A lapse of time generally goes to the weight and not the admissibility of evidence (*Rodgers*, 53 Ill. 2d at 213-14), and we do not think this time passage is sufficient to render these identifications unreliable, especially where both Mr. Butler and Mr. Garrett testified that the reason they did not come forward sooner was because they were "scared" and did not want to get involved.

¶ 83                    F. Other Factors Affecting the Witnesses' Credibility

¶ 84    Mr. Reynolds also argues that the identifications of Mr. Butler and Mr. Garrett should not be believed because both men were convicted felons and both men had motivations to lie. According to Mr. Reynolds, Mr. Butler was motivated to lie because he was in police custody and did not voluntarily talk to the police, while Mr. Garrett had a reason to lie because he had a pending felony case. Mr. Reynolds is not wrong that these circumstances could be viewed as evidence of bias, interest, or motive to testify falsely. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 98. Mr. Reynolds also points out that Mr. Butler was under the influence of alcohol and cannabinoids that night, although he denied it. Again, however, these issues were presented to the jury. Looking at all of the circumstances, we cannot say that the jury's verdict, based on these identifications, was so arbitrary or fanciful that no reasonable juror could have reached the same conclusion.

¶ 85    Mr. Reynolds largely relies on *O.F.*, 2020 IL App (1st) 190662, ¶ 53, in support of his argument that the identifications made by Mr. Butler and Mr. Garrett were insufficient to support a finding of guilt. But the circumstances in *O.F.* were different. In *O.F.*, the witness and the offender were both in moving vehicles, and the witness testified that the offender's vehicle "had not caught his attention until after it turned left and [the witness] was following the vehicle from behind." Here, the Cadillac had stopped, the witnesses were not moving, and both witnesses were engaged with the victim before the shooting. Also, in *O.F.* it was raining and cloudy. There was

no evidence that that was the case here. There is no indication in *O.F.* that the witness knew the offender previously. Finally, that was one identification in *O.F.*, rather than the two we have here. In short, *O.F.* is not persuasive authority for what should happen in this case.

¶ 86                                    IV. CONCLUSION

¶ 87     The identifications of Mr. Reynolds as the backseat shooter by Mr. Butler and Mr. Garrett were a sufficient basis on which to sustain this conviction. The circumstances that Mr. Reynolds points to are simply not enough to undermine the overall reliability of these two identifications to such a degree that no reasonable juror could have found Mr. Reynolds guilty.

¶ 88     We affirm the judgment of the trial court.

¶ 89     Affirmed.